Kenneth D. WILLIAMS *v.* STATE of Arkansas

CR 06-511                                              251 S.W.3d 290

Supreme Court of Arkansas
Opinion delivered March 1, 2007

---

*Jeff Rosenzweig*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., and *David R. Raupp*, Sr. Ass't Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Kenneth D. Williams appeals from an order of the circuit court, which denied his request for relief under Rule 37 of the Arkansas Rules of Criminal Procedure. On appeal, Williams asserts six points. None of his points has merit, and we affirm the circuit court.

Williams was convicted of the capital-felony murder of Cecil Boren and theft of property. He was sentenced to death for the capital-murder conviction and to forty years for theft under the habitual-offender enhancement. This court affirmed those convictions and sentences on direct appeal. *See Williams v. State*, 347 Ark. 728, 67 S.W.3d 548 (2002) ("*Williams I*").[1] Thereafter, Williams filed a petition for relief under Rule 37.5 of the Arkansas Rules of Criminal Procedure, in which he raised numerous points. The circuit court rejected Williams's claims and denied his petition for Rule 37.5 relief. From that denial comes this appeal.

## I. Ineffective Counsel

The first five points raised by Williams relate to claims of ineffective assistance of counsel at trial. This court has held that it will reverse the circuit court's decision granting or denying post-conviction relief only when that decision is clearly erroneous. *See Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006). This court has said, "[a] finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed." *Id.* at 25-26, 238 S.W.3d at 31.

When considering an appeal from a circuit court's denial of a Rule 37 petition, the question presented to this court is whether, based on the totality of the evidence, the circuit court clearly erred in holding that counsel's performance was or was not ineffective under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Howard, supra.* In *Howard*, we discussed this standard in detail:

---

[1] The facts involved in this case were described in detail in *Williams I.*

Under the standard set forth in *Strickland, supra*, to determine ineffective assistance of counsel, the petitioner must show first that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment. A court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Cook v. State*, 361 Ark. 91, 204 S.W.3d 532 (2005).

Second, the petitioner must show that the deficient performance prejudiced the defense, which requires showing that counsel's errors were so serious as to deprive the petitioner of a fair trial. Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. The petitioner must show there is a reasonable probability that, but for counsel's errors, the fact finder would have had a reasonable doubt respecting guilt, i.e., the decision reached would have been different absent the errors. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *See Cothren v. State*, 344 Ark. 697, 42 S.W.3d 543 (2001). The language, "the outcome of the trial," refers not only to the finding of guilt or innocence, but to possible prejudice in the sentencing. *Lasiter v. State*, 290 Ark. 96, 717 S.W.2d 198 (1986). In making a determination of ineffective assistance of counsel, the totality of the evidence must be considered. *Id*. Furthermore, trial strategy is not a basis for postconviction relief. *Wooten v. State*, 352 Ark. 241, 91 S.W.3d 63 (2002).

*Howard*, 367 Ark. at 31-32, 238 S.W.3d at 35-36.

### a. Victim-Impact Evidence

For his first point on appeal, Williams argues that his trial counsel were ineffective in the penalty phase by failing to object properly to the victim-impact evidence of the victim's sister, Annette Boren Knight.[2] The following colloquy is relevant to this issue:

> Ms. KNIGHT: The meeting of my brother and sisters when we get together it'll never be the same. We ask ourselves what can we do in situations like this. Well,

---

[2] Williams was represented by two attorneys at trial.

we can't do anything as a family but hold together and pray together. But you can do something. You are in a position to do that. What would you do if it was your brother or your sister or your baby that someone stole away from you. I can't do anything, but you can. No words can express how we feel. Silence, the silence of never hearing Peewee's voice again haunts me and it will continue to haunt me. We miss him. We want him back but we can't.

PROSECUTION: Thank you. Hold on a second. Do you have any questions?

DEFENSE COUNSEL: No questions. Can we approach? (Counsel approached the bench.)

DEFENSE COUNSEL: Once again, Judge, it's totally improper for her in victim impact to tell the jury what she wants them to do which is inferring she wants them to kill him. That's improper. Telling the jury that they are in a position to do something about this and she's not, that's improper. That is not the purpose of victim witness, your Honor. You just give me a continuing objection. I'll sit down and shut up.

In *Williams I, supra,* Williams claimed that it was error by the trial court to allow Ms. Knight's testimony, as quoted above. This court wrote, however, that Williams's counsel did not object until Ms. Knight had finished testifying. We held that, although Williams's counsel claimed that they had a continuing objection to this type of testimony, the record revealed no such objection. As a result, this court refused to hear Williams's argument on appeal where a specific, contemporaneous objection had not been made at trial. Now, in his Rule 37 appeal, Williams contends that his trial counsel were ineffective for failing to make the required contemporaneous objection.

The circuit court found, following the Rule 37 hearing, that Williams's counsel had made a strategic and tactical decision not to object to Ms. Knight's testimony so as not to draw attention to what she said and so as not to appear insensitive to her loss. Further, the circuit court concluded that Ms. Knight's testimony did not go so far as to tell the jury what to do. Because of this, the circuit court did not find any basis for declaring a mistrial; nor did

the court find strong enough grounds for sustaining an objection, had it been timely made. On the second prong of the *Strickland* test, the circuit court found that there was no reasonable probability that the jury's verdict would have been different had a timely objection been made.

On appeal, Williams disagrees and contends that there was no strategic or tactical justification for his trial counsel's failure to make a contemporaneous objection to Ms. Knight's testimony. He maintains that Ms. Knight suggested that the jury sentence him to death and that this was clearly improper. He emphasizes that the following statement from the circuit court to the prosecutor at trial indicates that there was no other plausible interpretation of Ms. Knight's remarks:

> TRIAL COURT: I think, you know, when you get to the point of ask[ing] them to put themselves in somebody else's place we're getting very close. I'm going to give you a few minutes and I'm going to get those written out statements and peruse them for content.

He further disagrees that he was not prejudiced as a result of his trial counsel's failure to make a timely objection. He urges that, under *Strickland*, the circuit court was wrong in holding that there was not a reasonable probability that the result would have been different had a proper objection been made. It is his contention that either the jury would not have imposed a death sentence or the death sentence would have been reversed. According to Williams, there was a reasonable chance that at least one juror would not have voted for death had this improper testimony from Ms. Knight not been allowed.

Williams relies on *Greene v. State*, 343 Ark. 526, 37 S.W.3d 579 (2001), but the instant case is distinguishable from *Greene*. In *Greene*, this court acknowledged that *Payne v. Tennessee*, 501 U.S. 808 (1991), was the seminal case in the area of victim-impact evidence. We also determined in *Greene* that, although victim-impact evidence was not always inadmissible, the introduction of opinions from the victim's family members concerning their feelings about what the appropriate penalty should be is not admissible as victim-impact evidence. In the instant case, however, we do not believe that Ms. Knight's testimony was objectionable, as it did not specifically instruct the jury on what she thought it should do. Rather, Ms. Knight only acknowledged the family's helplessness and the jury's power to make a decision regarding

Williams's punishment for the crimes he committed. We conclude that Ms. Knight's testimony is not the kind of testimony prohibited by *Greene.*

■ Moreover, the circuit court found that Williams's trial counsel's decision not to object in a timely manner was a matter of trial strategy so as not to draw attention to what she said and so as not to appear insensitive to her loss. We cannot say that the circuit court's findings in this regard were clearly erroneous. Because we hold that there was no error by trial counsel on this point, we need not address the prejudice prong under the *Strickland* analysis.

*b. Removal for Cause*

For his second point, Williams asserts that his trial counsel were ineffective in failing to challenge juror LaRhonda Washington for cause. He bases his argument on the fact that during *voir dire,* Ms. Washington agreed that in certain situations death is the only appropriate punishment. She also said that she "felt very strong about [the death penalty]," and that she "[felt] as though . . . the person that commit[ted] the crime should . . . pay the price for it." Williams emphasizes that his trial counsel did not move to challenge Ms. Washington for cause, but trial counsel admit that a peremptory challenge would have been used had one been available. He adds that because his trial counsel failed to challenge Ms. Washington for cause at trial, this court refused to consider the issue of her bias in the direct appeal.

Williams further claims that Ms. Washington failed to satisfy the "default position" for a capital juror, which is that she would consider the alternative punishment of life without parole. Williams contends, without citation to case law, that Ms. Washington's statement that she "maybe" would consider life without parole is not good enough for her to qualify as a fair juror in a death case. He concludes that this court should, at the very least, vacate the death penalty because the prejudice prong is satisfied if any one juror manifests actual bias.

This court has held that jurors are presumed unbiased and that the burden of proving actual bias is on the party challenging the juror. *See, e.g., Gardner v. State,* 296 Ark. 41, 754 S.W.2d 518 (1988). Regarding whether a juror is biased, this court has said:

> A potential juror may be challenged for cause if he or she is actually biased. A venireperson is actually biased if he or she cannot

try the case impartially and without prejudice to the substantial rights of the party challenging. Ark. Code Ann. § 16-33-304(b)(2)(A) (1987). This determination lies within the sound discretion of the trial court. *See Fleming v. State*, 284 Ark. 307, 681 S.W.2d 390 (1984).

*Henry v. State*, 309 Ark. 1, 5-6, 828 S.W.2d 346, 349 (1992). This court also held in *Henry* that a trial court is in the best position to access the demeanor of prospective jurors. *See id.*

To resolve this issue, it is necessary for this court to refer to the full range of answers given by Ms. Washington during *voir dire*. Ms. Washington did state that she favored the death penalty, although she also stated that she would consider life without parole as an option if a person was convicted of murder. When asked about how she felt about the death penalty, she responded:

> Well, at first, I felt very strong about it. And I feel as though as the person that commit the crime should do the price. Pay the price for it. I mean I feel very strong for it. I'm for it.

At times, Ms. Washington also said that she could impose the death penalty but that "maybe" she could impose a sentence of life without parole. When asked whether she thought death would be the only appropriate punishment if the defendant were found guilty, Ms. Washington quickly answered, "Yes, I do." However, after being asked whether she could consider life without parole, Ms. Washington answered that she "probably could . . . go with life without parole maybe," but admitted that she leaned toward the death penalty. When asked whether the fact that she had a brother who worked at the Varner unit would influence her decision in this case, Washington said, "No, it doesn't, because we don't even discuss his job. So it wouldn't have anything to do with it."

Ms. Washington added the following about the death penalty:

> I feel very strong about it and I feel that if you can do the crime you can pay the time. That's the way I feel about it. I mean, no, I — I mean, from the circumstance of what may be the cause of the reason, yes, sir, I'm for it. I mean — yes, I'm for the death penalty.

When asked what purpose the death penalty served, Ms. Washington answered:

Well, I feel that when any life has been taken for no apparent reason you know, I mean no it's not no purpose to be served, but those people could have had the chance to live also back when someone else commit this crime toward them. So — I feel like if you can — you can take someone else's life and — like that then.

But, at times, Ms. Washington said that if she was convinced that a person committed murder, the death penalty would not necessarily be the sentence of her choice and that she did not think the death penalty should be imposed in every case. She claimed that she felt like the death penalty would be appropriate "when someone's life has just been taken . . . for no apparent reason." She also said that she might also be willing to consider life without parole in such a situation. As a final point, Ms. Washington agreed to honestly look at the elements of each crime and compare them with the facts as she determined them to be.

■ While there is no dispute over the fact that the trial counsel failed to challenge Ms. Washington for cause, we conclude that their failure to do so did not render their representation ineffective. At the Rule 37 hearing, one of Williams's trial counsel testified that he did not believe he could prevail on a challenge for cause for the juror. That is because, he said, while Ms. Washington seemed to favor the death penalty, she also replied affirmatively that she could consider the full range of punishment, that she could consider mitigating circumstances and weigh them against aggravating circumstances, and that she would have to listen to the evidence to make a decision. Based on trial counsel's testimony and Ms. Washington's responses, the circuit court found no error in failing to challenge Juror Washington for cause. The circuit court further found that there was no prejudice to Williams in having Ms. Washington serve as a juror because there was not a reasonable probability that the results in either the guilt or the penalty phase of the trial would have been different had Ms. Washington not served as a juror. We agree.

We hold that the factual bases for reaching its decision were not clearly erroneous, and we affirm the circuit court on this point.

### c. Mitigating Evidence

For his third argument, Williams contends that his trial counsel were ineffective in failing to object properly to the jury's failure to consider mitigating evidence. Williams notes that after

the jury did not check anything on Form 2, which dealt with mitigating circumstances, the trial judge, without objection from trial counsel, instructed the jury to check at least one of the factors on Form 2.

Form 2 consists of four parts: Part A — the mitigating circumstances the jury found probably existed; Part B — the mitigating circumstances that one or more members of the jury believed probably existed, but that the jury did not unanimously agree that such mitigating circumstances probably existed; Part C — the circumstances that the jury found were supported by some evidence, but after considering this evidence, the jury unanimously agreed that it was insufficient to establish that the mitigating circumstances probably existed; Part D — that no evidence of a mitigating circumstance was presented by either party during any portion of the trial. The jury marked one circumstance under Part C: "Kenneth D. Williams experienced family dysfunction which extended from generation to generation."

According to Williams, the jury simply ignored numerous proposed mitigating circumstances in Form 2 by not checking them, such as his youth, repeated hospitalization as an infant, parental substance abuse, inadequate parenting, and his learning disabilities, among others. He strongly maintains that his trial counsel's failure to object to the jury's failure to complete the verdict forms properly was ineffective assistance of counsel. As a corollary point, he contends that the jury should have found more mitigators than it did because sufficient evidence was presented to support their existence. For example, he claims that a properly formed rejection of those proposed mitigators should have consisted of the jury's checking all of them in Part C, which would show that the jury considered them but that there was insufficient evidence to support them. However, according to Williams, what the jury did was ignore the mitigation circumstances proposed in Form 2, all of which were substantiated by his expert, Dr. Mark Cunningham. The jury did this, he claims, because of passion and prejudice.

In support of his argument, Williams cites us to *Giles v. State*, 261 Ark. 413, 549 S.W.2d 479 (1977), and argues that this error, in addition to being at odds with *Giles*, is also a violation of his rights against cruel and unusual punishment and due process under both the federal and state constitutions. He further relies on *Penry v. Johnson*, 532 U.S. 782 (2001), for the proposition that errors in filling out verdict forms or a mistaken understanding by the jury

about what is required in the verdict forms taints the death sentence under the Eighth Amendment. Williams finally claims that the *Wicks* plain-error rule was in effect and applies to this case. *See Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980).

In *Williams I*, this court considered Williams's argument that the jury impermissibly ignored mitigating evidence that it was bound to consider. We noted that Williams had specifically alleged the jury erred when it concluded that the unrefuted evidence concerning his mental and family dysfunction was insufficient to establish a mitigating factor. Relying on *Davasher v. State*, 308 Ark. 154, 823 S.W.2d 863 (1992), we concluded that this claim had no merit. We further observed that it is the jury's decision to give the appropriate weight to the evidence before it.

This court has repeatedly held that Rule 37 does not allow an appellant the opportunity to reargue points that were decided on direct appeal. *See, e.g., Kemp v. State*, 348 Ark. 750, 74 S.W.3d 224 (2002); *Coulter v. State*, 343 Ark. 22, 31 S.W.3d 826 (2000); *Weaver v. State*, 339 Ark. 97, 3 S.W.3d 323 (1999); *Hulsey v. State*, 268 Ark. 312, 595 S.W.2d 934 (1980). Because this mitigation issue was addressed by this court on direct appeal and found to be meritless, we refuse to consider it a second time in this Rule 37 petition.

With regard to the other proposed mitigators in Part C, we have made the role of the jury clear:

> This court has previously held that "[a] jury is not required to find a mitigating circumstance just because the defendant puts before the jury some evidence that could serve as the basis for finding the mitigating circumstance." *Bowen* [*v. State*, 322 Ark. 483, 497, 911 S.W.2d 555, 561] (citing *Duncan v. State*, 291 Ark. 521, 726 S.W.2d 653 (1987), and *Hill v. State*, 289 Ark. 387, 713 S.W.2d 233 (1986), *cert. denied*, 479 U.S. 1101, and *cert. denied*, 484 U.S. 873 (1987). This court held further that the jury alone determines what weight to give the evidence, and may reject it or accept all or any part of it the jurors believe to be true. *Id.* (citing *Davasher v. State*, 308 Ark. 154, 823 S.W.2d 863, *cert. denied*, 504 U.S. 976 (1992), and *Robertson v. State*, 304 Ark. 332, 802 S.W.2d 920 (1991)).

*Hill v. State*, 331 Ark. 312, 317, 962 S.W.2d 762, 764 (1998). Given this broad authority in the jury for determining whether mitigating circumstances exist, we do not believe that the jury erred in this case

by failing to conclude that any other proposed mitigator constituted a mitigating circumstance. The mere fact that evidence is presented by trial counsel that an issue constitutes a mitigator does not mean that the jury is required to conclude that it is. *See Bowen, supra.* We affirm the circuit court on this point.

### d. Supporting Documentation of Mitigating Evidence

For his fourth point, Williams maintains that his trial counsel were ineffective in failing to introduce into evidence the supporting documentation of mitigating evidence relied on by his expert witness, Dr. Mark Cunningham. This documentation entailed court records, psychiatric and psychological records, and school records, as well as the results of the neuropsychological examination conducted by Dr. Mary Weatherby. Williams contends that the failure to introduce these documents deprived him of buttressing his case for mitigating circumstances with additional evidence.

Williams adds that the records demonstrate the troubled childhood of a young child shuffled between a chaotic home, the violent streets, foster care, and the Division of Youth Services, without the capability to deal with these stresses. He contends that he was prejudiced because the jury rejected, even in Part C of Form 2, evidence on which Dr. Cunningham (or others) testified but on which no documents were produced, including: health problems in infancy, including meningitis; that his parents were substance abusers and wholly inadequate and irresponsible as parents; his mother's mild mental retardation; his father's absence from the home; the chronic marital conflict and domestic violence; the family's poverty; his own mental problems including attention deficit disorder, learning disabilities and borderline retardation; and that he was an example of the abject failure of the Arkansas juvenile court system. According to Williams, had the jury possessed these documents, there is a reasonable probability that these mitigating factors would have been found in Parts A or B of Form 2, and the jury would not have sentenced him to death. Williams relies on *Wiggins v. Smith*, 539 U.S. 510 (2003), which he claims is authority for this proposition.

We fail to see the error by trial counsel in this regard. Dr. Cunningham testified at trial for an hour and a half, including his use of a Power Point presentation, about each of these circumstances that Williams submitted to the jury as proposed mitigation. We do not see how the underlying documents relied

on by Dr. Cunningham would have established mitigation in the jurors' minds when his testimony did not. Trial counsel maintain that it was their strategy to rely on Dr. Cunningham's testimony alone. We agree with the circuit court that this was not attorney error. Moreover, *Wiggins v. Smith, supra,* is not apposite to the facts of the instant case. In *Wiggins,* trial counsel failed to investigate appropriately the defendant's troubled childhood as a mitigator. Here, trial counsel presented a substantial case through the testimony of Dr. Cunningham. This issue has no merit.

### e. Shackling at Trial

For his fifth point, Williams claims that his shackling at trial was decided under an erroneous legal standard and, to the extent that it might be argued that the issue was defaulted, he asserts that his counsel were ineffective. While Williams recognizes that the shackling issue was raised on direct appeal, he claims that this court should reconsider its holding in light of *Deck v. Missouri,* 544 U.S. 622 (2005), which was handed down after this court's decision in *Williams I.*

The circuit court held that it could not consider this issue because of the ban on relitigating matters at the Rule 37 stage that were raised on direct appeal. The circuit court also added, however, that if it were to address this issue again, Williams's argument would still fail under a *Deck* analysis. The circuit court recited the facts surrounding the crimes that Williams committed, including his escape from prison, and underscored that the trial judge had found special circumstances, including security concerns, that required shackling in this case in order to protect the courtroom and its occupants.

In *Deck,* the Court said, "due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." 544 U.S. at 632. The Court went on to explain:

> [C]ourts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding. The constitutional requirement, however, is not absolute. It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling. In so doing, it accommodates the important need to protect the courtroom and its

occupants. But any such determination must be case specific; that is to say, it should reflect particular concerns, say, special security needs or escape risks, related to the defendant on trial.

*Deck*, 544 U.S. at 633.

The Court recognized that "[l]ower courts have disagreed about the specific procedural steps a trial court must take prior to shackling, about the amount and type of evidence needed to justify restraints, and about what forms of prejudice might warrant a new trial, but they have not questioned the basic principle." *Id.* at 629.

Finally, the Court said:

[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury *absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.* Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Id.* at 629 (emphasis added).

The State emphasizes the following specific language in the *Deck* opinion regarding the necessity for restraints:

[W]here a court, *without adequate justification*, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18 (1967).

*Deck*, 544 U.S. at 635 (emphasis added). Here, the State asserts there was clearly adequate justification. We agree.

In *Williams I*, this court noted, "[a] trial court may take such steps as are reasonably necessary to maintain order in the courtroom, especially where the criminal defendant has engaged in disruptive behavior, attempted escape, or is charged with violent felonies." 347 Ark. at 747, 67 S.W.3d at 559. We added on the issue of shackling:

Restraints are not *per se* prejudicial, and the defendant must affirmatively demonstrate prejudice. We will not presume preju-

dice when there is nothing in the record to indicate what impression may have been made on the jurors or where the appellant did not offer any proof of prejudice. *Tucker [v. State*, 336 Ark. 244, 983 S.W.2d 956]; *Hill v. State*, 285 Ark. 77, 685 S.W.2d 495, 496 (1985). Williams has a long criminal past, including a conviction for capital murder, and two convictions for kidnapping and arson. He was on trial for capital murder, aggravated robbery, theft, and escape. Additionally, evidence was offered to show that at the prior trial for capital murder, Williams had taunted the victims and victims' relatives and had ended up in an altercation with one. This required officers to carry Williams from the courtroom. It would be difficult to imagine a criminal defendant that would better fit the definition of a high-risk defendant. Williams offers no proof of prejudice beyond the general assertion that he could not be tried in restraints, with the exception of one prospective juror during voir dire who was excused for cause. The remainder of the jurors stated that they understood the necessity for the security and that it would not influence their decision as to whether Williams was guilty of these felony charges. The trial court did not abuse its discretion, and Williams's right to a fair trial was not violated. The restraint was reasonably necessary to maintain order in the courtroom. *Terry v. State*, 303 Ark. 270, 796 S.W.2d 332 (1990).

*Williams I*, 347 Ark. at 747-48, 67 S.W.3d at 559-60.

■ There was testimony at the Rule 37 hearing about Williams's violent acts, including two murders, his past disruptive behavior, and his attempts to escape. The proper standard was applied by this court because there was adequate justification for Williams's shackles. The standard announced in *Deck,* which places the burden of proving a lack of prejudice to the defendant on the State, only pertains where there is no adequate justification for a defendant wearing shackles during his trial. The circuit court's decision must be affirmed on this point.

## II. *Authority to Retain Investigator*

For his sixth, and final, point, Williams argues that the circuit court abused its discretion in denying authorization at the Rule 37 hearing to retain an investigator to probe into issues of jury bias and misconduct. Williams notes that during the Rule 37 litigation, he moved for authorization of funds for an investigator and explained:

- That the case was tried in Lincoln County, the site of the prison from which Williams was found to have escaped. A substantial percentage of the residents have association with the prison system, either personally or through family members. The deceased, Cecil Boren, had been an official of the prison system.

- That jury selection was obviously a crucial component of the trial. In the event that any jurors falsely represented to the Court and counsel that neither they nor their families had association with the prison system or the Boren family, such false representations would entitle Williams to relief and would give him grounds to amend or supplement the Rule 37 petition to include a juror misconduct claim.

- That a withholding of relevant evidence of relationships in fact was the scenario presented in the important Supreme Court case of *Williams v. Taylor*, 529 U.S. 420 (2000).

Williams explains that Rule 37.5(j) of the Arkansas Rules of Criminal Procedure provides the following:

> (j) *Compensation of appointed attorney.* Compensation to be paid to attorneys appointed under this rule, as well as the fees and expenses to be paid for investigative, expert, and other reasonably necessary services, shall be fixed by the circuit and appellate courts in their respective proceedings at such rates or amounts as the courts determine to be reasonable. All compensation and reasonable expenses authorized by the courts shall be paid pursuant to Ark. Code Ann. § 16-91-202(f), or as otherwise provided by law.

Ark. R. Crim. P. 37.5(j) (2006).

Williams argues that Rule 37.5, as well as its legislative counterpart, Arkansas Code Annotated § 16-91-204 (Repl. 2006), is an attempt to comply with the "opt-in provisions" of 28 U.S.C. § 2261, which provides in pertinent part:

> (b) This chapter is applicable if a State establishes by statute, rule of its court of last resort, or by another agency authorized by State law, a mechanism for the appointment, compensation, *and payment of reasonable litigation expenses of competent counsel* in State postconviction proceedings brought by indigent prisoners whose capital convictions and sentences have been upheld on direct appeal to the court of last resort in the State or have otherwise become final for

State law purposes. The rule of court or statute must provide standards of competency for the appointment of such counsel.

28 U.S.C. § 2261(b) (1996) (emphasis added by appellant).[3]

According to Williams, an investigation is warranted in order to determine whether the jurors were telling the truth about potential bias during *voir dire*. He adds that the reasonableness of the request is highlighted by the fact that the investigation would only cover the thirteen people who actually sat on the jury during the guilt or penalty phase.[4] Williams admits that he does not know specifically whether there might have been any misrepresentations made by the jurors who were selected for his trial because the circuit court denied him the resources with which to discover such information. He relies on *Williams v. Taylor, supra*, for his contention that the investigation of the jurors who actually sat on a jury is a reasonable litigation expense in postconviction proceedings.

Williams asserts that this court should reverse and remand for the provision of funds, or, otherwise, the federal court will provide the funds for the investigation. He further opines that an affirmance of the circuit court's ruling on this matter will have a repercussion far beyond what happens to him. He explains that Arkansas has not yet been deemed an opt-in state and adds that the 2006 amendments to § 2261 have placed the original decision regarding opt-in status in the hands of the United States Attorney General, with *de novo* review by the United States Court of Appeals for the D.C. Circuit. According to Williams, affirming the circuit court would contradict the public policy of the State of Arkansas, and would render risible the State's claim that Arkansas has a

---

[3] Note that the 2006 Amendments — via Pub. L. 109-177, § 507(a) — rewrote Subsection (b). The amended version now provides:

(b) Counsel. — This chapter is applicable if —

(1) the Attorney General of the United States certifies that a State has established a mechanism for providing counsel in postconviction proceedings as provided in section 2265; and

(2) counsel was appointed pursuant to that mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent.

28 U.S.C. § 2261(b) (2006).

[4] An alternate juror was seated as a replacement juror during the penalty phase.

"mechanism for the appointment, compensation, and payment of reasonable litigation expenses." 28 U.S.C. § 2261(b) (1996). He maintains that were the State to argue that a mechanism is in place for reasonable litigation expenses, the denial of funds to do the very thing blessed by a unanimous Supreme Court decision renders the State's position ludicrous. Williams concludes that this court should reverse the circuit court's denial of relief with instructions to authorize funds for such an investigation.

As a beginning point, we believe that our standard of review for the trial court's decision denying funds for an investigation is abuse of discretion. On the merits of the issue, we conclude that Williams has failed to demonstrate the need for an investigator. Both parties quote language from *Williams v. Taylor, supra*, that states that the State does not have an obligation to pay for an investigation when the claims have not been developed in any respect. *See Taylor*, 529 U.S. at 443 ("We do not suggest the State has an obligation to pay for investigation of as yet undeveloped claims; but if the prisoner has made a reasonable effort to discover the claims to commence or continue state proceedings, § 2254(e)(2) will not bar him from developing them in federal court."). Nothing required Williams's counsel to rely exclusively on an investigator to investigate whether one of the thirteen jurors had failed to disclose information accurately during *voir dire* or in the completion of their respective jury questionnaires. The obvious question is why Williams's counsel for his Rule 37 petition did not investigate the matter initially himself for purposes of his Rule 37 petition to determine whether any juror seated for the trial was dishonest in his or her *voir dire* responses.

We hold that the circuit court did not abuse its discretion in failing to authorize funds for an investigation absent any proof that such an investigation was warranted. Even Williams remarked in his brief on appeal: "We do not know whether any similar misrepresentation occurred in Kenneth Williams's trial because the circuit court denied Williams the resources with which to find out." The circuit court obviously believed that more had to be shown to warrant the expenditure of investigative funds. The circuit court did not abuse its discretion in this regard.

Affirmed.

IMBER, J., not participating.