Cite as 2019 Ark. App. 380

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** CR-18-829

| | | |
|---|---|---|
| PAUL SUCHEY, JR. | | **Opinion Delivered:** September 18, 2019 |
| | APPELLANT | |
| V. | | APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT [NO. 16JCR-13-1109] |
| STATE OF ARKANSAS | | |
| | APPELLEE | |
| | | HONORABLE BRENT DAVIS, JUDGE |
| | | AFFIRMED |

## BART F. VIRDEN, Judge

Paul Suchey, Jr., was convicted in the Craighead County Circuit Court of first-degree battery and was sentenced to thirty-five years' imprisonment. This court upheld his conviction in *Suchey v. State*, 2016 Ark. App. 225, 490 S.W.3d 320. Suchey filed a Rule 37 petition alleging ineffective assistance of counsel, and after a hearing, the court denied his petition. Suchey appeals the trial court's denial of his petition. We affirm.

I. *Relevant Facts*

At the trial, the following relevant testimony was offered. Britney Hockett was living with Suchey, who is now her ex-husband, and their infant son, L.S., at her parents' home. Because Suchey is disabled, he cared for L.S. while Hockett worked two jobs. On the morning of September 2, 2013, Hockett was scheduled to work from 9:30 a.m. to 5:00 p.m. Hockett said that when she awoke around 7:30 a.m., L.S. was "his normal self" and

that she left for work around 8:30 a.m. Her parents left that morning around 10:30 a.m. Hockett's mother, Debbie, said that she thought L.S. seemed "fine" when she returned home briefly around 2:00 p.m. According to Hockett's sister, Dana Johnson, L.S. was "very happy and giggling" when she saw him around 2:00 p.m. Debbie came home again around 4:00 p.m. to prepare supper, and she left shortly afterward.

When Hockett arrived home around 6:20 p.m., Suchey told her that a barking dog had wakened L.S. from his nap, which caused him to become "fussy." Hockett could not comfort the baby, who continued to cry. When Johnson stopped by around 7:00 p.m., L.S. was crying and moaning, and Johnson offered to hold him. Unlike Hockett, Johnson held the baby such that the right side of his head was not pressed against her arm, and L.S. calmed down. It was then that Johnson commented that L.S.'s head seemed "deformed." On closer inspection, Johnson said it looked as though L.S. had "an egg-shaped tumor" on the right side of his head.

Hockett drove L.S. to the hospital by herself because Suchey had insisted on following them in his own vehicle. Hockett testified that she and her family were crying and "all panicked" but that Suchey sat playing a game on his phone. Hockett testified that she was told by the doctor that L.S. had one of the worst skull fractures he had seen and that it looked like L.S. had been struck in the head with a baseball bat. Debbie recalled that when the doctor was speaking, Suchey never looked at him or at L.S. Debbie testified that she asked Suchey whether he had done something to the baby and that Suchey only looked at her but said nothing.

Joe Robinson, a patrolman with the Jonesboro Police Department, was dispatched to the hospital with a report of possible child abuse. Robinson said that he could not get much information from Hockett and the grandmother because they were crying. Suchey, on the other hand, did not show much emotion. Suchey first told Robinson that he did not know what had happened to the baby. He then said that while he was bouncing the baby on his knees, the baby slipped and hit his head on Suchey's knee. Next, Suchey said that as he was carrying the baby down the hallway, his legs just "gave out," he lost his balance, and the baby's head hit a door frame. Robinson said that Suchey quickly changed the subject to his disability. Sergeant Brad Rossman, who was also with the Jonesboro Police Department, testified that he had been informed by doctors that L.S.'s injury was caused by blunt-force trauma and that he told Suchey the baby could not have been hurt in the manners he had described to Robinson. According to Rossman, Suchey said, "That's my story[,] and I'm sticking to it."

Dr. Mickey Deal, an emergency-room physician at St. Bernard's Medical Center in Jonesboro, described feeling fluid and moving bones when he touched L.S.'s head and diagnosed a depressed skull fracture. During direct examination, Dr. Deal stated that the parietal plates in an infant's skull are not easy to break and that a break results from a substantial impact. He further stated that such injuries were generally caused by being struck with objects like a hammer, a baseball bat, or steel-toed boots; however, on cross-examination, he acknowledged that falls against hard objects such as bricks or door frames could cause such injuries. Dr. Deal said that skull fractures like L.S.'s are potentially life

threatening and that surgery is generally considered. Dr. Deal determined that L.S. needed to see a neurosurgeon immediately, so the baby was airlifted to Memphis.

Dr. Karen Lakin, a physician at Le Bonheur Children's Hospital in Memphis, who is board certified in both general pediatrics and child-abuse pediatrics, and an assistant professor of pediatrics at the University of Tennessee, testified that a 3-D CT image of L.S.'s head showed a large crack all the way across his skull, separation, and some depression, which she diagnosed as a complex skull fracture. Dr. Lakin stated that it took a lot of concentrated force to cause that injury. Dr. Lakin said that such fractures are caused by significant blows to the head resulting from, for example, a car accident, a fall from a balcony, or being struck with a baseball bat, a hammer, or a brick. According to Dr. Lakin, L.S. also suffered subdural bleeding, the pain from which she described as "the worst headache" one could ever have. She further stated that the subdural bleeding in connection with the complex fracture was "a very serious injury" and that such trauma to a three-month-old infant is "certainly life threatening." When asked how such trauma could threaten a baby's life, Dr. Lakin said that any major impact or trauma to the brain that results in a fracture is "a significant injury," which increased the risk for complications that may not be apparent until later in life. Dr. Lakin noted that treating infants can be difficult because they cannot say what happened, how much the injury hurts, and how long the pain lasts. On cross-examination, Dr. Lakin explained that the amount of force that caused the injury could not be quantified and that she could not determine whether the force was accidentally or intentionally applied.

4

A jury convicted Suchey of first-degree battery, a Class Y felony. During the sentencing phase, Suchey stated to the jury, "I still don't know if it was actually me that hurt my son. If it was, I'm sincerely sorry about it." Suchey was sentenced to thirty-five years' imprisonment.

In his Rule 37 petition, Suchey asserted that counsel was ineffective for the following reasons: (1) counsel pressured Suchey not to take the stand in his defense; thus, the decision was not made knowingly, voluntarily, or intelligently and resulted in prejudice;[1] (2) counsel failed to present testimony or evidence to support Suchey's defense. Specifically, Suchey alleges that counsel did not present testimony or evidence to rebut medical-expert testimony regarding the cause of L.S.'s head injury, and counsel did not investigate or present evidence regarding the medication Suchey was taking at the time of L.S.'s injuries that caused him to have a "flat" and unemotional demeanor.

Suchey requested and was granted a hearing. A summary of the relevant testimony at the Rule 37 hearing follows. Dr. Douglas Holland, a family physician with experience in cardiac life support, advanced-trauma life support, and pediatric life support and helicopter service, disputed that the two-millimeter depression in L.S.'s skull was a serious injury because infants' skulls are "flexible" and that the brain is protected by the flexibility of the skull. Dr. Holland agreed with Dr. Lakin's testimony that L.S.'s medical chart showed that he had bleeding under the fracture. Dr. Holland stated that he did not interpret L.S.'s injuries as intentionally inflicted, that Dr. Deal unnecessarily upset L.S.'s family by

---

[1]Suchey abandons this argument on appeal.

5

"overinterpreting" L.S.'s injury, and that Dr. Deal started "the entire course" of the suspicion of abuse. Dr. Holland also opined that he could not rule out that L.S.'s injuries were nonaccidental.

Dr. Holland addressed Suchey's claim that on the day of L.S.'s injury he had been taking medication that affected his demeanor. He stated that he was aware of the forensic report completed in October 2014 that set forth the following:

**MEDICAL HISTORY**:
Mr. Suchey has followed up with medical treatment at the VA for back pain, fibromyalgia, kidney problems, migraines and liver problems. He discontinued medical treatment in August 2013. In the current interview, he said that he was required to follow up at the Memphis VA, and "it was too far to drive." He reported no history of serious head injuries, seizures, or hospitalizations.

**MENTAL HEALTH TREATMENT HISTORY**:
He reported no history of outpatient mental health treatment or psychiatric hospitalizations. He has been prescribed Cymbalta, fluoxetine, and amitriptyline by previous VA providers. He stated that Cymbalta was for fibromyalgia and amitriptyline was for sleep problems. He was unsure of the reason for taking fluoxetine.

**Current Psychiatric Medications**: None.

Dr. Holland testified that the forensic report did not state that Suchey was taking any of the medications he claims to have been taking at the time of the injury but that Cymbalta can cause a person to have a flat, unemotional demeanor. Dr. Holland also explained that taken together, Cymbalta and fluoxetine can cause "over-excitation, confusion and hallucinations."

Brian Miles and Thomas Haynes, Suchey's trial counsel, testified at the hearing that originally the defense strategy was to focus on challenging the element of the offense requiring serious physical injury. The medical records and the imaging of L.S.'s injury, gave

6

counsel reason to believe that they could establish that L.S. had sustained a linear fracture rather than the more serious complex fracture. When Miles received images of L.S.'s fracture from Le Bonheur that depicted obvious separation of the bones along the fracture line characteristic of a complex fracture, he consulted his neighbor, an orthopedic surgeon whom he had consulted with in the past, and his mother-in-law, who is a nurse practitioner in an emergency room. Both the surgeon and the nurse opined that the fracture met the criteria for "serious physical injury," and counsel shifted the primary focus of the defense to establishing that the injury could have reasonably been inflicted by accidental means. Miles stated that he did not attempt to obtain a medical expert to opine on the seriousness of the injury because he was not sure how to secure funds for this type of expert witness, and there was a time shortage because the date of the trial was fast approaching. Also, Miles explained that if the defense chose to present an expert to opine on the accidental nature of the injury, the State would then offer the testimony of Dr. Lowery Beck and family members that on two occasions before September 2, 2013, L.S. had sustained bruises while in Suchey's care. Miles explained that they planned to, and did, obtain through Haynes's cross-examination of Dr. Lakin that L.S.'s injuries could have been caused accidentally and that she could not quantify the amount of force that caused the injury. Miles testified that Haynes elicited additional testimony from Dr. Deal that it was impossible to quantify the amount of force that caused the injury and that a fall into a door frame could have caused the injury. Miles explained that by obtaining this testimony from the doctors on cross-examination, they avoided opening the door to testimony regarding L.S.'s prior injuries while in Suchey's care.

7

Miles also offered testimony regarding Suchey's demeanor during trial preparation. He explained that Suchey "was always very laid back, didn't show emotion. That was just Paul." Miles testified that he and Haynes were concerned that if Suchey testified at trial "the jury wouldn't like him, that he wouldn't show any emotion." Miles recalled that when Suchey testified during the sentencing phase it was "a disaster." Miles testified that

> [w]hat was damaging was his lack of ability to show emotion, and that he nonchalantly said, "If I did it, I'm sorry." I will never forget it. But to me, that was just the way Paul was. I don't know if it was medication, or his personality, but his demeanor and he had no emotion.

Suchey testified at the hearing that at the time of L.S.'s injuries, he was taking fluoxetine, amitriptyline, "Pro-something for migraines," and Cymbalta but that he stopped taking them when he was in the county jail after his arrest. He explained that

> [a]fter I got out around October 30, until I had the trial in May of the next year I do not get back on all my meds. By trial time I wasn't on any of my meds at that point because I had quit going to the VA. I had been off my medications for about a year. The time Mr. Miles was testifying about my demeanor and speech I was not on medications.

Suchey testified that he told his attorneys about the medications he was taking when L.S. was injured but that Miles and Haynes never investigated the matter.

After the hearing, the trial court denied Suchey's petition. Suchey timely filed a notice of appeal.

## II. *Standard of Review and Applicable Law*

This court has held that it will reverse the trial court's decision granting or denying postconviction relief only when that decision is clearly erroneous. *Anderson v. State*, 2015 Ark. 18, 454 S.W.3d 212. A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite

8

and firm conviction that a mistake has been committed. *Sartin v. State*, 2012 Ark. 155, 400 S.W.3d 694.

When considering an appeal from a trial court's denial of a Rule 37 petition based on ineffective assistance of counsel, the sole question presented is whether, based on a totality of the evidence under the standard set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), the trial court clearly erred in holding that counsel's performance was not ineffective. *Chunestudy v. State*, 2014 Ark. 345, 438 S.W.3d 923.

The benchmark for judging a claim of ineffective assistance of counsel must be "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Pursuant to *Strickland*, we assess the effectiveness of counsel under a two-prong standard. First, a petitioner raising a claim of ineffective assistance must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *Williams v. State*, 369 Ark. 104, 251 S.W.3d 290 (2007). There is a strong presumption that trial counsel's conduct falls within the wide range of professional assistance, and an appellant has the burden of overcoming this presumption by identifying specific acts or omissions of trial counsel, which, when viewed from counsel's perspective at the time of the trial, could not have been the result of reasonable professional judgment. *Henington v. State*, 2012 Ark. 181, 403 S.W.3d 55. Second, the petitioner must show that counsel's deficient performance so prejudiced petitioner's defense that he or she was deprived of a fair trial. *Holloway v. State*,

9

2013 Ark. 140, 426 S.W.3d 462. A petitioner making an ineffective-assistance-of-counsel claim must show that counsel's performance fell below an objective standard of reasonableness. *Abernathy v. State*, 2012 Ark. 59, 386 S.W.3d 477 (per curiam). The petitioner must show that there is a reasonable probability that, but for counsel's errors, the fact-finder would have had a reasonable doubt respecting guilt, i.e., the decision reached would have been different absent the errors. *Breeden v. State*, 2014 Ark. 159, 432 S.W.3d 618 (per curiam). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id*. "The outcome of the trial" refers not only to the finding of guilt or innocence, but also to possible prejudice in sentencing. *Id*. Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Id*. "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

### III. *Points on Appeal*

#### A. Failure to Investigate and Present Expert Medical Testimony

Suchey claims that counsel was ineffective for failing to consult with "an independent medical expert to review L.S.'s medical records and render an opinion regarding the likely cause of the child's head injury." Suchey claims that he suffered prejudice from counsel's ineffectiveness because

> [h]ad trial counsel investigated and explored this matter, he would have determined that testimony from a defense medical expert was necessary. Such an expert could, and would, have testified that the head injury suffered by the child was not necessarily

10

caused by any type of deliberate blow to the head but could have just as easily resulted from accidental trauma.

Suchey's argument fails because Suchey has not shown prejudice resulting from trial counsel's decision not to obtain an expert medical witness through the Arkansas Public Defender Commission. In denying the petition, the court found that counsel testified at the hearing that

> should the defense present an expert to opine on the possible accidental nature of the mechanism for injury, the State would present the 404(b) evidence from Dr. Lowery Beck and others regarding other injuries (bruising) that the child had sustained while in the care of Suchey in the past three and a half months prior to September 2, 2013. Miles and Haynes testified that they decided that based on the transcript of the testimony of Dr. Lakin from the DHS hearing, and what she had told Haynes when he discussed the case with her, that they could get her to acknowledge that the injuries could have been caused by accidentally inflicted trauma. Dr. Deal, the emergency room physician, testified at trial that you cannot quantify the amount of force sufficient to cause the injury he observed in L.S. On direct examination, he gave examples of some possible implements that might cause such injury, and on cross examination, he acknowledged that falls against hard objects such as bricks or doorframes could cause such injuries. Dr. Lakin testified that she couldn't definitively say whether the injuries sustained by L.S. were accidental or non-accident related, nor could she quantify the amount of force required. She also testified that she could not rule out accidental causes of L.S.'s fractures.

The court determined that the testimony that supported the defense's theory that L.S.'s injuries could have been caused by an accidental fall against the door frame was brought before the jury during cross-examination of the State's medical witnesses, and "the testimony [from a defense witness] would not have rebutted the testimony of the State." Moreover, Dr. Holland testified that he could not determine from L.S.'s medical records whether the injury was accidental or intentional. Dr. Holland also opined that "[i]n a situation where a child has a head injury, you're going to have a series of other injuries that have occurred over weeks or months, and a history of abuse in the family that includes ER

11

visits, calls to the police, general upheaval, and neighbor complaints. To my knowledge, none of that is present." In fact, the very evidence that the defense avoided having before the jury by not calling its own medical expert was that of Dr. Beck and family members regarding two prior instances in which L.S. had sustained bruises while in Suchey's care. At a pretrial hearing, the court had deemed the evidence of L.S.'s prior injuries admissible, and Dr. Beck, L.S.'s grandmother, and L.S.'s mother were present at trial and prepared to testify if Suchey opened the door by calling an expert medical witness.

This court has held that the objective in reviewing an assertion of ineffective assistance of counsel concerning the failure to call a certain witness is to determine whether this failure resulted in actual prejudice that denied the petitioner a fair trial. *Hayes v. State*, 2011 Ark. 327, 383 S.W.3d 824. In order to demonstrate prejudice, the petitioner must establish that there is a reasonable probability that, had counsel performed further investigation and presented the expert witness, the outcome of the trial would have been different. *See Shipman v. State*, 2010 Ark. 499 (per curiam). The fact that there was a witness, or witnesses, who could have offered beneficial testimony is not, in itself, proof of counsel's ineffectiveness. *Feuget v. State*, 2015 Ark. 43, 454 S.W.3d 734. When a petitioner pursuant to Rule 37 claims ineffective assistance of counsel based on the failure of counsel to call an expert witness, the petitioner bears the heavy burden of supporting the allegations with facts that establish that the defense suffered actual prejudice arising from counsel's conduct. *See id*. As stated, there is a strong presumption that trial counsel's conduct falls within the wide range of reasonable professional assistance. *Anderson*, 2015 Ark. 18, 454 S.W.3d 212. The claimant must provide facts that affirmatively support his or her claims of prejudice; neither

conclusory statements nor allegations without factual substantiation are sufficient to overcome the presumption that counsel was effective, and such statements and allegations will not warrant granting a Rule 37.1 petition. *Winters v. State*, 2014 Ark. 399, at 6, 441 S.W.3d 22, 26.

Suchey did not show that there is a reasonable probability that but for counsel's error, the fact-finder would have had a reasonable doubt respecting guilt, and the outcome of the proceeding would have been different. Here, counsel's decision to refrain from offering the testimony of an expert did not violate the *Strickland* standard for a showing of ineffective assistance of counsel.

B. Failure to Investigate and Present Proof Regarding Medications

Suchey asserts that counsel was ineffective for failing to investigate and present evidence when L.S.'s skull was fractured Suchey was taking prescription medication for depression and posttraumatic stress syndrome that caused him to appear unemotional and flat. Suchey contends that had the jury known that at the time of L.S.'s injury he was taking fluoxetine, Cymbalta, Metformin, and amitriptyline, this information would have provided a plausible explanation for his demeanor, and the outcome of the trial would have been different. The trial court questioned Suchey's credibility finding that his "testimony as to when he was taking the medications is at odds with the information he provided to the forensic examiner." In the denial of Suchey's Rule 37 petition, the trial court found that

> [n]o VA records, reports or documents reflecting any information as to when or if any of these medications were prescribed and if he actually had received his prescriptions was provided. No information from the VA was provided to the forensic examiner. Based on these facts, the court determines that Suchey's attorneys' failure to investigate was reasonable based on the credible information that they had

13

available to them, and their observation of their client's flat and unemotional behavior on a regular basis while not on medications.

The trial court also found that Suchey's allegation that "'much of the State's case revolved around Suchey's demeanor while at the hospital' is just not accurate. Much of the case involved his actions when he was confronted with his infant son's injury both at home and at the hospital." The court found that the State offered testimony regarding Suchey's actions on the day L.S. was injured, including his responses to police and family when questioned about L.S.'s injuries, testimony that Suchey played with his phone when L.S. was being examined and after Suchey was informed of the seriousness of the injuries, and that Suchey delayed going to the hospital to pack a bag.

We hold that the trial court correctly found that Suchey has failed to demonstrate either prong of the *Strickland* test. Moreover, Suchey's contention that he was taking medications that affected his demeanor at the time of L.S.'s injury amounts to an allegation without factual substantiation because, aside from his statement to the forensic examiner that he had at one time been taking the medications listed, Suchey never provided any documentation regarding when he may have been prescribed the medications or that he obtained the medications from a pharmacy. As stated above, neither conclusory statements nor allegations without factual substantiation are sufficient to overcome the presumption that counsel was effective, and such statements and allegations do not warrant granting a Rule 37.1 petition. *Winters*, *supra*.

Affirmed.

HARRISON and KLAPPENBACH, JJ., agree.

*Craig Lambert*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christian Harris*, Ass't Att'y Gen., for appellee.

14