Ledell **LEE**, Plaintiff–Appellant

v.

Wendy **KELLEY**, Director, Arkansas Department of Correction, Defendant–Appellee

No. 17-1840

United States Court of Appeals, Eighth Circuit.

Submitted: April 20, 2017

Filed: April 20, 2017

Ledell Lee, Pro se.

Lee Deken Short, Short Law Firm, North Little Rock, AR, Cassandra Stubbs, American Civil Liberties Union, Capital Punishment Project, Durham, NC, for Plaintiff–Appellant.

Nicholas Jacob Bronni, Valerie G. Fortner, Kent G. Holt, Ashley Argo Priest, Assistant Attorneys General, Christian

Harris, Darnisa E. Johnson, Lee P. Rudofsky, Attorney General's Office, Little Rock, AR, for Defendant–Appellee.

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.

PER CURIAM.

About five hours before Ledell Lee's scheduled execution, two appeals were brought to this court. In the first, the district court determined that, under *Gonzalez v. Crosby*, 545 U.S. 524, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005), it lacked jurisdiction on the ground that Lee's motion for relief from judgment under Federal Rule of Civil Procedure 60(b) was, in substance, a successive petition for habeas corpus under 28 U.S.C. § 2254. The district court concluded that, although Lee's motion was styled as one to reopen judgment under Rule 60(b), Lee was actually seeking to litigate new claims under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). The court transferred the matter to our court. *See Burton v. Stewart*, 549 U.S. 147, 153, 127 S.Ct. 793, 166 L.Ed.2d 628 (2007). However, Lee voluntarily dismissed the matter before any determination could be made. No. 17-1838.

In this appeal, Lee challenges the district court's alleged denial[1] of his motion requesting funds under 18 U.S.C. § 3599(f) for "ancillary services to assist in the preparation of clemency and potential additional litigation." Lee now moves for a stay of execution. We deny his motion for stay.

 "A stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Johnson v. Lombardi*, 809 F.3d 388, 390 (8th Cir. 2015) (citation omitted) (internal quotation marks omitted), *quoting Hill v. McDonough*, 547 U.S. 573, 584, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006). To receive a stay, Lee "must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits." *Id.*

 To receive a stay of execution, it is not enough that Lee show a significant possibility of success of the merits of *some* claim. Rather, Lee must show a significant possibility that he will succeed on the merits of a claim that would deprive Arkansas of the authority to execute him. *See Durr v. Cordray*, 602 F.3d 731, 736-37 (6th Cir. 2010).

 Lee has not made that showing. Even if he succeeded on his § 3599(f) claim, Arkansas would still have the authority to execute him. Lee argues that the appointment of funds could lead to a chain of events that might include Governor Hutchinson approving clemency, the state Parole Board reconsidering its previous recommendation of denial of clemency, or later habeas proceedings. But these potential down-the-road effects do not give this court the authority to issue a stay.

The motion for stay is denied.

KELLY, Circuit Judge, concurring.

The district court transferred this matter to this court citing 28 U.S.C. § 2244(b)(3)(A), the statutory provision that says an applicant must receive permission from the court of appeals before filing a successive habeas petition. Thus, I construe Lee's most recent filing as part

---

1. The district court in fact did not deny Lee's motion for funds but rather transferred the motion to our court.

and parcel of his Rule 60(b) motion seeking, among other things, an opportunity to pursue an Atkins claim—a motion the district court ruled was, instead, a successive petition. I would grant the appeal from the district court's denial of funds Lee has requested to investigate his Atkins claim, because in my view, Lee's failure to present an Atkins claim in his prior habeas proceedings does not bar him from pursuing the Atkins claim challenging his imminent execution. See Atkins v. Virginia, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that executing an intellectually disabled[2] person is unconstitutional). Because this court has recently held otherwise, I reluctantly must concur in the result, but I write separately to express my concerns.

The Eighth Amendment categorically prohibits executing inmates who fall within one of three discrete classes: juveniles, the incompetent, and the intellectually disabled. Roper v. Simmons, 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The law is clear that § 2244's ban on successive petitions does not apply to a petitioner's claim that his scheduled execution would violate the Eighth Amendment because he is incompetent. Stewart v. Martinez-Villareal, 523 U.S. 637, 645–46, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998); see also Ford v. Wainwright, 477 U.S. 399, 409–10, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (holding execution of incompetent inmates is unconstitutional). The Supreme Court explained that a petitioner's prior habeas petition cannot bar such a claim because it cannot be adjudicated until the state obtains an execution warrant; it is only at that time that the execution becomes "imminent" and the petitioner's "competency to be executed" can be determined. Martinez-Villareal, 523 U.S. at 644–45, 118 S.Ct. 1618. This is the case even where the petitioner raises an incompetency claim for the first time after the state has obtained an execution warrant, and after a prior habeas application has been denied. Panetti v. Quarterman, 551 U.S. 930, 945, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

Like the Eighth Amendment prohibition on executing the incompetent, the Eighth Amendment prohibition on executing the intellectually disabled is "a substantive restriction on the State's power to take the life" of an inmate. Atkins, 536 U.S. at 321, 122 S.Ct. 2242 (quoting Ford, 477 U.S. at 405, 106 S.Ct. 2595). In Ford, the Supreme Court explained the rationale behind the prohibition on the execution of the incompetent, noting, inter alia, the questionable "retributive value of executing a person who has no comprehension of why" he is being executed. Ford, 477 U.S. at 409, 106 S.Ct. 2595. The rationale for prohibiting the execution of the intellectually disabled is striking similar. Atkins highlighted retribution and deterrence as significant factors, recognizing that the lesser culpability of an intellectually disabled offender warrants exempting those offenders from the ultimate criminal penalty: death. Atkins, 536 U.S. at 319–20, 122 S.Ct. 2242. But the Court has also said that "[n]o legitimate penological purpose is served by executing a person with intellectual disability . . . [and t]o do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being." Hall v. Florida, —— U.S. ——, 134 S.Ct. 1986, 1992, 188 L.Ed.2d 1007 (2014); accord Brumfield v. Cain, —— U.S. ——, 135 S.Ct. 2269, 2283,

---

**2.** The Atkins decision uses the term "mentally retarded." The updated term "intellectually disabled" has the same meaning.

192 L.Ed.2d 356 (2015) ("[I]t would violate the Eighth Amendment to permit the State to impose the 'law's most severe sentence,' Hall, 572 U.S., at ——, 134 S.Ct. at 1993, *and take his life as well.*" (emphasis added)).

In this case, no court has had the opportunity to determine whether Lee was intellectually disabled at any time during the criminal proceedings, including at the time of the offense. This court has perceived a determinative distinction between a claim of incompetence under Ford and a claim of intellectual disability under Atkins because, in its view, incompetence can change over time while intellectual disability cannot. See Davis v. Kelley, No. 04-2192. True, a diagnosis of intellectual disability is not as susceptible to fluctuation as a diagnosis of mental illness amounting to incompetence. But intellectual disability is by no means static in every case. The DSM-5 explains,

> Although intellectual disability is generally nonprogressive, in certain genetic disorders (e.g., Rett syndrome) there are periods of worsening, followed by stabilization, and in others (e.g., Sanfilippo syndrome) progressive worsening of intellectual function. After early childhood, the disorder is generally lifelong, although severity levels may change over time. The course may be influenced by underlying medical or genetic conditions and co-occurring conditions (e.g., hearing or visual impairments, epilepsy). Early and ongoing interventions may improve adaptive functioning throughout childhood and adulthood. In some cases, these result in significant improvement of intellectual functioning, such that the diagnosis of intellectual disability is no longer appropriate.

Diagnostic and Statistical Manual of Mental Disorders 38–39 (DSM-5) (5th ed. 2013); see also James C. Harris, Intellectual Disability: Understanding Its Development, Causes, Classification, Evaluation, and Treatment (2005) ("[T]he intellectually disabled person's level of functioning is not static and ... an individual's adaptive behavior may be improved through habilitation."); Simon Whitaker, The Stability of IQ in People With Low Intellectual Ability: An Analysis of the Literature, 46 Intellectual and Developmental Disabilities 120, 123 (2008) (fourteen percent of study subjects with low IQs saw changes of ten or more points on IQ evaluations performed at different times). In short, intellectual disability may ebb and flow, depending on a variety of factors, including the underlying cause of disability, the extent of intervention, and the presence of co-occurring conditions. Of particular relevance to Lee's claim, scientific studies indicate that in cases of intellectual disability arising from fetal alcohol syndrome, deficits in adaptive functioning are likely to become more severe with age. See Carmen Rasmussen, et al., Neurobehavioural outcomes of children with fetal alcohol spectrum disorders: A Canadian perspective, 13 Paediatrics & Child Health 185, 188 (2008) (collecting studies).

I also note that our case law has recognized that a diagnosis of intellectual disability is not always stable. For instance, in Sasser v. Hobbs (Sasser II), we explained that the "timing of proof" matters for an Atkins claim because an individual's intellectual disability can improve over time, and because an individual "may have better evidence of his condition at one point in life than another." 735 F.3d 833, 846 (8th Cir. 2013). Similarly, in the context of Social Security appeals, we have held that the presumption that a claimant's IQ remains stable over time may be rebutted by "evidence of a change in [a claimant]'s intellectual functioning." See, e.g., Phillips v. Colvin, 721 F.3d 623, 629 (8th Cir. 2013) (affirming the ALJ's determina-

tion that the claimant did not meet the listing for "mental retardation," despite a prior evaluation indicating he had a full-scale IQ of 64, because substantial evidence showed his intellectual functioning had improved since the evaluation).

More important, however, the distinction regarding stability over time cannot overshadow what incompetency and intellectual disability have in common: If a person suffers from either, he cannot be executed. Thus, because it is unconstitutional to execute a person who is intellectually disabled, it must be determined whether Ledell Lee is intellectually disabled before his sentence is carried out—whether that determination comes near the time of the offense or near the time of execution.[3]

The reasoning of Martinez-Villareal and Panetti applies to Atkins claims as well: The question of whether the inmate is constitutionally *eligible for execution* is therefore ripe for resolution only when the execution is imminent. See Singleton v. Norris, 319 F.3d 1018, 1023 (8th Cir. 2003) ("[A] habeas petition raising a claim that had not arisen at the time of a previous petition is not barred by § 2244(b)....."). Indeed, we have previously recognized the application of Martinez-Villareal and Panetti to Atkins claims. In Nooner v. Niles (Nooner II), we assumed that Martinez-Villareal and Panetti applied to both Ford and Atkins claims. 499 F.3d 831, 833 n.2 (8th Cir. 2007). Furthermore, Atkins left to the states the tasks of defining intellectual

disability and establishing procedures to implement Atkins' prohibition on the execution of mentally disabled offenders. Atkins, 536 U.S. at 317, 122 S.Ct. 2242. "[T]he Arkansas Supreme Court has consistently construed its state's statutory right to be concurrent with the federal constitutional right established in Atkins." Sasser II, 735 F.3d at 842–43 (citing Anderson v. State, 357 Ark. 180, 163 S.W.3d 333, 354–55 (2004)). And, our court has held that Ark. Code. Ann. § 5-4-618 "preclud[es] the execution of an individual who can prove mental retardation *either* (a) at the time of committing the crime *or* (b) at the presumptive time of execution." Id. at 846 (footnote omitted).

In my view, the bar on successive petitions does not apply to Atkins claims filed after the state has obtained an execution warrant, and thus it does not apply to Lee's Atkins claim. "[T]here was accordingly no need for him to apply for authorization to file a second or successive petition." Martinez-Villareal, 523 U.S. at 642, 118 S.Ct. 1618, and it is therefore immaterial that Lee has previously failed to argue the merits of an Atkins in a federal habeas proceeding; such a claim could not have challenged the constitutionality of Lee's now-imminent execution. See Panetti, 551 U.S. at 946, 127 S.Ct. 2842; Martinez-Villareal, 523 U.S. at 644–45, 118 S.Ct. 1618 (acknowledging that the district court was unable to resolve the prisoner's Ford claim

---

**3.** Under Arkansas law, intellectual disability requires a finding of "[s]ignificantly subaverage general intellectual functioning accompanied by a significant deficit or impairment in adaptive functioning manifest[ing] ... no later than age eighteen (18) years of age." Ark. Code Ann. § 5-4-618. Thus, whether the evaluation is conducted near the time of the offense or near the time of execution, the evaluator must look back in time to make this assessment, using whatever evidence, testing, or other indicators are available. Because a

finding that an offender is intellectually disabled at the time of execution requires a demonstration that the offender manifested symptoms of intellectual disability before age 18, the inquiry into whether an offender is intellectually disabled at the time of his execution is, in fact, relevant to the offender's moral culpability at the time of the crime. While it may be more difficult to conduct this analysis as years pass, it cannot be said to be impossible.

at the time of his initial habeas filing); Nooner II, 499 F.3d at 834 ("[T]he setting of an execution date caused the ... claims to become ripe."). Because Lee's execution is imminent, statutory restrictions on the filing of successive habeas petitions should not prevent the court from determining whether he belongs to one of the three discrete classes of inmate that the Supreme Court has held the United States Constitution prohibits executing. See Roper, 543 U.S. at 568, 125 S.Ct. 1183.

Lee presents a prima facie Atkins claim that has never been addressed on the merits. Lee presents evidence that he repeated multiple grades in school and was placed in special education before he dropped out of school when he was in ninth grade due to difficulty understanding his schoolwork. Psychological testing performed by a neuropsychologist, Dr. Watson, demonstrated that Lee has "significantly subaverage" functioning in nearly every intellectual area, and the examiner characterized Lee's deficits in verbal and non-verbal memory and learning as "striking."

Dr. Watson also concluded to a reasonable degree of professional certainty that Lee has a neurodevelopmental disorder such as fetal alcohol syndrome, an intellectual disability that one is born with. Lee's mother drank throughout her pregnancy, and Dr. Watson concluded that Lee exhibits physical manifestations of fetal alcohol syndrome, including small and very wide-set eyes and pointed or folded ears. Additionally, Lee's cognitive and behavioral functioning (including attention and memory problems, difficulty with judgment and reasoning, learning disability, and potential brain damage) is consistent with fetal alcohol syndrome. Lee has presented a prima facie case that he has "significantly subaverage general intellectual functioning" that manifested before age 18, and that he has "a significant deficit or impairment in

adaptive functioning" with a "deficit in adaptive behavior." Ark. Code. § 5-4-618(a)(1).

Because I believe Lee should be allowed to file a petition based on Atkins as it applies to his execution, I would also address Lee's motion to stay his execution. In addition to concluding that Lee has a "likelihood of success on the merits" of his motion, as discussed above, I also believe that "the relative harms to the parties," and "the extent to which [Lee] has delayed unnecessarily in bringing the claim" weigh in favor of granting Lee's motion to stay his execution. Nooner v. Norris (Nooner I), 491 F.3d 804, 808 (8th Cir. 2007) (quoting Nelson v. Campbell, 541 U.S. 637, 649–50, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004)).

The balance of harms here unquestionably weighs in Lee's favor. Here, the state's interest in executing Lee on this expedited timeline is rooted in the imminent expiration of its supply of midazolam and its concern that it may be unable to obtain more. That interest is outweighed by Lee's interest in ensuring that his execution is not carried out in violation of the constitutional prohibition against executing a person who is intellectually disabled.

Additionally, Lee's execution is scheduled for April 20, 2017, and he filed his motion on April 18, 2017. As explained above, Lee's intellectual capacity at the time of his execution could not be adjudicated until his execution was imminent. See Nooner II, 499 F.3d at 834 (citing Martinez-Villareal, 523 U.S. at 644–45, 118 S.Ct. 1618). Lee brought the instant challenge to his execution soon after the governor signed the order setting Lee's execution date and after the parole board recommended denying clemency. Because Lee argues that he is entitled to a determination that he will not be intellectually disabled at the time of his execution—not just at the time of his sentencing—he has

not unreasonably delayed in filing this motion for stay. See Nooner I, 491 F.3d at 810 (discussing Panetti and noting that "a condition of the mind which may not manifest itself until so late a time that a stay becomes necessary in order to evaluate properly the asserted mental deficiency" presents an argument distinct from a challenge to execution protocol).

The question presented in this case is whether the state of Arkansas can constitutionally execute a man who may very well be intellectually disabled. "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). That purpose is not served by executing someone whose colorable claim of intellectual disability has never before been considered by any court, due in large part to a string of lawyer error and incompetence.[4] Congress could not have intended such a result when it barred inmates from filing successive habeas petitions. As the Supreme Court has recognized, when Congress enacted AEDPA, "it did so without losing sight of the fact that the 'writ of habeas corpus plays a vital role in protecting constitutional rights.'" Holland v. Florida, 560 U.S. 631, 649, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010) (quoting Slack v. McDaniel, 529 U.S. 473, 483, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)). To sanction an interpretation of AEDPA that closes the courthouse doors to an Atkins claim of intellectual disability at this stage of the proceedings and under these circumstances would cast a shadow on "the integrity of [Lee's] trial process," Hall, 134 S.Ct. at 1993, and pervert "the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon," Mapp v. Ohio, 367 U.S. 643, 647, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (quoting Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886)).

---

**4.** The evidence shows that Lee has been represented by unqualified, unreliable, and unstable counsel at critical stages of his long journey through the court system. For example, in 2001, Lee filed a petition for writ of habeas corpus in federal court. After reviewing the transcripts of Lee's state post-conviction proceedings, the district court noted that Lee's appointed counsel in those state proceedings "may have been impaired to the point of unavailability on one or more days" of the post-conviction hearing. This lawyer later admitted he struggled with substance abuse issues while he was representing Lee, and that he participated in Lee's post-conviction hearings while intoxicated. As another example: One of the lawyers who represented Lee in federal post-conviction proceedings later had his law license suspended due to serious mental health issues. It was at this stage of the proceedings that the state argues Lee "abandoned the pursuit of an Atkins claim." Lee, however, is the one who will suffer the consequences of the failures of his prior counsel.