**Kenneth Dewayne WILLIAMS, Petitioner**

v.

**Wendy KELLEY, Director, Arkansas Department of Correction, Respondent**

**Nos. 17-1892, 17-1893, 17-1896**

United States Court of Appeals, Eighth Circuit.

Submitted: April 26, 2017

Filed: April 27, 2017

James H. Moreno, Assistant Federal Public Defender, Shawn Nolan, FEDERAL COMMUNITY DEFENDER OFFICE, Philadelphia, PA, for Petitioner.

Kenneth Dewayne Williams, Pro Se.

Nicholas Jacob Bronni, Kelly Hook Fields, Kathryn Henry, Kent G. Holt, Assistant Attorney Generals, ATTORNEY GENERAL'S OFFICE, Little Rock, AR, for Respondent.

Before WOLLMAN, RILEY, and KELLY, Circuit Judges.

PER CURIAM.

Kenneth Dewayne Williams is scheduled to be executed on April 27, 2017. On April 25, 2017, Williams filed in federal district court a motion for relief from judgment under Federal Rule of Civil Procedure 60(b)(6), an amended petition for writ of habeas corpus, and related motions to stay the execution. Williams argued that extraordinary circumstances of juror misconduct and bias justified the reopening of his federal habeas proceedings under Rule 60(b)(6) and that his Eighth Amendment claim that he is categorically ineligible to

be executed based on his intellectual disability should not be subject to the strictures of 28 U.S.C. § 2244(b). The district court determined that the motion for relief and the petition for writ constituted second or successive habeas corpus applications that were not previously authorized by this court. The district court thus determined that it was without jurisdiction to entertain the matters and exercised its discretion to transfer them to this court. See 28 U.S.C. § 2244(b)(3); Boyd v. United States, 304 F.3d 813, 814 (8th Cir. 2002) (per curiam).

On April 26, 2017, Williams filed an application for a certificate of appealability, reiterating his argument that he is ineligible to be executed based on his intellectual disability. He also filed a protective application under 28 U.S.C. § 2244, seeking leave to file a second or successive habeas petition in light of the Supreme Court's March 28, 2017, holding in Moore v. Texas, — U.S. ——, 137 S.Ct. 1039, 197 L.Ed.2d 416 (2017), and because no reasonable factfinder could have sentenced Williams to death, had it known about his intellectual disability. In both matters, Williams filed related motions for stay of execution.

We consolidate the three matters now pending before us. With respect to the case transferred from the district court (No. 17-1892), we conclude that the motion for relief and the petition for writ constitute second or successive habeas applications, and we deny authorization for the district court to consider them. We deny Williams's application for a certificate of appealability (No. 17-1893) as moot. We deny Williams's protective application to file a second or successive habeas petition (No. 17-1896). We also deny the motions for stay of execution that are currently pending in each of the three cases.

## I. Background

Williams began serving a life sentence on September 15, 1999, for capital murder, attempted capital murder, kidnapping, aggravated robbery, theft, and arson. He was imprisoned at the Cummins Unit of the Arkansas Department of Corrections. On October 3, 1999, Williams escaped from prison and proceeded to the nearby residence of Cecil Boren, where he killed Boren and stole Boren's firearms and vehicle. Williams was captured the next day, after a high-speed car chase that ended when the vehicle he was driving collided with a water truck, killing its driver.

In 2000, Williams was convicted of the capital murder of Boren. During trial, Dr. Mark Cunningham, a clinical and forensic psychologist, testified that Williams suffered from a number of psychological problems and that he had an IQ score between 67 and 75, which Cunningham described as being on the "borderline between mental retardation and ... borderline intellectual functioning." The verdict form included a mitigating circumstance of "borderline mental retardation," and the jury did not indicate that it found evidence of this mitigating circumstance. Williams was sentenced to death. The Arkansas Supreme Court affirmed his conviction and sentence. Williams v. State, 347 Ark. 728, 67 S.W.3d 548 (2002).

Williams, through attorney Jeffrey Rosenzweig, thereafter petitioned for state post-conviction relief under Rule 37 of the Arkansas Rules of Criminal Procedure. During the Rule 37 litigation, Williams requested authorization "to retain an investigator to probe into issues of jury bias and misconduct." Williams v. State, 369 Ark. 104, 251 S.W.3d 290, 301 (2007). Williams pointed out that his case was tried in the county where the Cummins Unit is located, that many residents of that county were thus associated with the prison system, and that Boren had been an official of the prison system. Accordingly, Williams ar-

gued that if any of the jurors had falsely represented "that neither they nor their families had association with the prison system or the Boren family, such false representations would entitle Williams to relief and would give him grounds to amend or supplement the Rule 37 petition to include a juror misconduct claim." Id. The circuit court denied funds for an investigation into juror misconduct. The Arkansas Supreme Court held that the circuit court did not abuse its discretion in doing so, concluding that Williams had failed to demonstrate the need for an investigator. Id. at 302 (citing Williams v. Taylor, 529 U.S. 420, 443, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000)).

Williams's Rule 37 petition also included a claim that trial counsel was ineffective in failing to submit evidence of mental retardation,[1] which exempts a person from the death penalty under Arkansas law, and a claim that Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), precluded the imposition of the death penalty against him because he was mentally retarded. The circuit court granted Williams's motion for funds to hire an expert and an investigator on his Atkins claim, whereupon Rosenzweig retained Dr. Ricardo Weinstein, a psychologist, as an expert, and Mary Paal, as a mitigation specialist. At a later evidentiary hearing, however, Rosenzweig informed the circuit court that Williams would not pursue either of the claims that were based on Williams's alleged mental retardation. The

circuit court denied Williams's remaining claims, and the Arkansas Supreme Court affirmed the denial of post-conviction relief.[2] See Williams, 251 S.W.3d at 303.

Williams thereafter filed a petition for writ of habeas corpus in federal district court under 28 U.S.C. § 2254, arguing, among other things, that the denial of funds for an investigation into juror bias and misconduct was an unreasonable application of Williams v. Taylor. This petition did not include an Atkins claim. Williams argued that Taylor established that the investigation of jurors constitutes a reasonable litigation expense, and he urged the district court to authorize funds for an investigation into juror misconduct. The district court rejected Williams's argument that the Arkansas Supreme Court misapplied Taylor and concluded that state courts were not required to provide funds for investigation of jurors "merely upon a request that is unsupported by any allegation reflecting the existence of juror misconduct or a hint thereof." Williams v. Norris, No. 5:07cv00234, 2008 WL 4820559, at *16 (E.D. Ark. Nov. 4, 2008).

The district court denied Williams's habeas petition and granted a certificate of appealability on several grounds, including whether the circuit court had erred in denying Williams funding to investigate claims of juror bias and misconduct. We concluded that "Williams had no right to funding for an investigation to develop entirely speculative claims" and affirmed the denial of habeas relief. Williams v. Norris,

---

1. The United States Supreme Court now uses the term "intellectually disabled," see Hall v. Florida, —— U.S. ——, 134 S.Ct. 1986, 1992, 188 L.Ed.2d 1007 (2014), and not "mentally retarded." We use the term "mentally retarded" only when discussing a claim that originally used that language.

2. Rosenzweig's decision not to pursue the Atkins claim may have been influenced in part by the fact that two months before trial

Williams's two experienced criminal-defense trial attorneys filed a motion to allow Williams to participate as co-counsel at trial. Such a clear expression of their confidence in Williams's mental capacity does much to allay any concern that "[m]entally retarded defendants may be less able to give meaningful assistance to their counsel." Atkins, 536 U.S. at 320, 122 S.Ct. 2242.

612 F.3d 941, 959 (8th Cir. 2010) ("[T]he Court specifically precluded this type of claim when it wrote, '[w]e do not suggest the State has an obligation to pay for investigation of as yet undeveloped claims.'" (quoting Taylor, 529 U.S. at 443, 120 S.Ct. 1479)), *cert. denied,* 562 U.S. 1290, 131 S.Ct. 1677, 179 L.Ed.2d 622 (2011).

On February 27, 2017, Arkansas Governor Asa Hutchinson scheduled Williams's execution for April 27, 2017. On April 11, Rosenzweig, who had represented Williams throughout Williams's state post-conviction proceedings and federal habeas proceedings, moved in federal district court for the appointment of co-counsel, which the court granted. Thereafter, James Moreno, an Assistant Federal Defender from the Capital Habeas Unit in the Eastern District of Pennsylvania, entered his appearance, and on April 21, the district court granted Rosenzweig's motion to withdraw from Williams's habeas matter. As set forth above, Williams thereafter filed in district court the motion for relief and the petition for writ that have been transferred here and also filed in this court an application for a certificate of appealability and a protective application to file a second or successive habeas petition.[3]

## II. Motion for Relief from Judgment

We first consider William's argument that he is entitled to relief from judgment and that his federal habeas proceedings should be reopened because his right to an impartial jury was violated. He claims that "[t]he appointment of the [Federal Defender's Office] represented the first time during post-conviction litigation that Mr. Williams had attorneys with the funds to conduct a juror investigation." That investigation revealed, according to Williams, "significant evidence of jury misconduct, bias[,] and exposure to improper evidence," including the following: unbeknownst to defense counsel or the court, a juror worked at the Cummins Unit and told other jurors that prison conditions for inmates serving life sentences were better than the conditions for inmates sentenced to death; the jury foreman stated during voir dire that his religious beliefs would not interfere with his jury service, but he nevertheless consulted a Bible during deliberations, referred to verses in the Old Testament, and led the other jurors in prayer; a sheriff falsely told one or more of the jurors that Williams had threatened them and that precautionary measures had been taken; one juror refused to consider mitigating evidence because "[o]nce she had decided Mr. Williams's guilt, [she] felt that he should be sentenced to death"; and two jurors did not disclose that they knew the victim or the victim's family members.

Federal Rule of Civil Procedure 60(b) allows a habeas petitioner to seek relief from final judgment and to request the reopening of his case in certain circumstances. When a Rule 60(b) motion presents a claim, however, it is treated as a

---

**3.** Williams filed two motions to recall the mandate and two motions for stay in the Arkansas Supreme Court on April 21, 2017. The state court claims are similar to those Williams raised in the federal district court, including claims of jury bias and misconduct and of ineligibility for the death penalty based on his alleged intellectual disability. Additionally, Williams argued to the Arkansas Supreme Court that he should not be executed because he was sentenced to death on a non-unanimous verdict and because the jury failed to consider his mitigating evidence. As an alternative claim for relief, Williams argued that jurisdiction should be reinvested in the circuit court to consider a petition for writ of error coram nobis on the basis of suppressed evidence of a juror's employment at the Cummins Unit. The Arkansas Supreme Court denied Williams's four motions on April 26, 2017.

second or successive habeas petition under the Antiterrorism and Effective Death Penalty Act and must meet the exacting standards of 28 U.S.C. § 2244(b). "For the purpose of determining whether the [Rule 60(b)] motion is a habeas corpus application, claim is defined as an 'asserted federal basis for relief from a state court's judgment of conviction' or as an attack on the 'federal court's previous resolution of the claim *on the merits.*'" Ward v. Norris, 577 F.3d 925, 933 (8th Cir. 2009) (quoting Gonzalez v. Crosby, 545 U.S. 524, 530, 532, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005)). No claim is presented if the motion attacks "some defect in the integrity of the federal habeas proceedings" or if the motion "merely asserts that a previous ruling which precluded a merits determination was in error—for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar." Gonzalez, 545 U.S. at 532 & n.4, 125 S.Ct. 2641.

Williams argues that his Rule 60(b) motion does not present any claim but instead attacks a defect in the integrity of the federal habeas proceedings—namely, the district court's denial of funds to investigate the jury. He compares the district court's denial of funds to a procedural ruling that precludes consideration of the merits of a claim. Williams's arguments are misplaced.

■ As an initial matter, Williams did not assert a claim of juror bias or misconduct in the federal habeas proceeding.[4] Instead, he argued that the Arkansas Supreme Court unreasonably applied United States Supreme Court precedent when it affirmed the state trial court's denial of funds for an investigation. The district court's denial of Williams's requested investigatory funds did not constitute a defect in the integrity of the federal habeas proceedings, given that Williams's potential claim was "entirely speculative." See Williams, 612 F.3d at 959. Moreover, the denial of funds was not "a previous ruling which precluded a merits determination." Gonzalez, 545 U.S. at 532 n.4, 125 S.Ct. 2641. The district court fully considered the claim that Williams actually presented, and its denial of the requested funds in this case was not equivalent to a "denial [of habeas relief] for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar." Id. We agree with the district court's succinct characterization of Williams's argument as "conflating a procedural ruling with a non-existent ruling on a never-asserted claim." D. Ct. Order of April 26, 2017, at 8.

■ Williams also argues that attorney Rosenzweig was ineffective for failing to undertake an investigation into juror bias or misconduct. To the extent that this argument is not foreclosed by Ward, we conclude that this claim is sufficiently similar to a habeas corpus application that failing to subject it to the requirements of a second or successive habeas petition would be inconsistent with 28 U.S.C. § 2254. See Ward, 577 F.3d at 932 ("Although an assertion of ineffective assistance of [federal] habeas counsel may be characterized as a defect in the integrity of the habeas proceeding, it ultimately seeks to assert or reassert substantive claims with the assistance of new counsel."); Gonzalez, 545 U.S. at 531, 125 S.Ct. 2641 ("A habeas petitioner's filing that seeks vindication of such a claim is, if not in substance a habeas corpus application, at least similar enough that failing to subject it to the

---

4. We note that Williams raised a claim of ineffective assistance of counsel for failure to strike a certain juror for cause, as impermissibly biased. See Williams, 612 F.3d at 953-55. Williams does not now rely on evidence of bias related to that juror.

same requirements would be inconsistent with the statute." (internal quotation marks and citations omitted)). Because Williams's Rule 60(b) motion constitutes a second or successive habeas petition and because Williams has not shown that his juror misconduct claim can meet the requirements set forth in 28 U.S.C. § 2244(b), we do not authorize the district court to consider the juror misconduct claim that Williams has raised. See § 2244(b)(3)(C) ("The court of appeals may authorize the filing of a second or successive application only if it determines that the application satisfies the requirements of this subsection.").

■ Finally, even if we were to conclude that Williams's motion was not a second or successive habeas petition, Williams has not shown "extraordinary circumstances" that would justify relief from judgment under Rule 60(b)(6). See Gonzalez, 545 U.S. at 535, 125 S.Ct. 2641. Williams was convicted and sentenced to death in 2000. The jurors could have been interviewed any time thereafter. In its 2007 decision, the Arkansas Supreme Court remarked, "The obvious question is why Williams's counsel for his Rule 37 petition did not investigate the matter initially himself for purposes of his Rule 37 petition to determine whether any juror seated for the trial was dishonest in his or her *voir dire* responses." Williams, 251 S.W.3d at 302. Williams has not been diligent in pursuing evidence of juror misconduct. That counsel finally presented such evidence, mere days before Williams's scheduled execution, does not justify the reopening of Williams's habeas proceedings, for his claim does not approach that raised in Buck v. Davis, — U.S. —, 137 S.Ct. 759, 778, 197 L.Ed.2d 1 (2017), in which it was found that the petitioner "may have been sentenced to death in part because of his race."

### III. Amended Petition for Writ of Habeas Corpus

Williams contends that since their appointment, the Federal Defenders have discovered evidence of Williams's intellectual disability that had not previously been presented. As is most relevant here, Williams offers evidence that Dr. Weinstein did not reach a diagnosis of Williams, did not complete scoring on some of the tests he had performed on Williams, and was never asked to do so by Rosenzweig. Dr. Weinstein states that after Williams's current counsel contacted him, requested that he score the tests he had performed on Williams, and provided him with additional materials that he was unable to evaluate during the Rule 37 proceedings, he concluded that Williams qualifies as intellectually disabled and that he so qualified at the time of Williams's offense. Similarly, Dr. Cunningham stated that, although he had testified at Williams's trial that Williams was not mentally retarded, he concluded that Williams was intellectually disabled after current counsel requested that he review the data previously available to him during his evaluation in 2000, new data available from subsequent testing, and advances in psychometric analysis. Dr. Cunningham stated that he could have provided this analysis had he been asked to do so during Williams's postconviction proceeding. Dr. Daniel Martell also stated that, after evaluating Williams at current counsel's request, he diagnosed Williams with an intellectual disability.

■ Williams argues that his current application is not a "second or successive habeas corpus application" subject to the requirements of 28 U.S.C. § 2244. Section § 2244(b) provides:

(1) A claim presented in a second or successive habeas corpus application un-

der section 2254 that was presented in a prior application shall be dismissed.

(2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

"[B]efore the district court may accept a successive petition for filing, the court of appeals must determine that it presents a claim not previously raised that is sufficient to meet § 2244(b)(2)'s new-rule or actual-innocence provisions. [28 U.S.C.] § 2244(b)(3)." Davis v. Kelley, 854 F.3d 967, 970 (8th Cir. 2017) (per curiam) (quoting Ward, 577 F.3d at 932).

■ Williams contends that § 2244(b) does not bar his Atkins claim because intellectual disability, like incompetency to be executed, not only prohibits the imposition of a death sentence but also prohibits his actual execution, and that this latter claim did not ripen until the issuance of an execution warrant. See Panetti v. Quarterman, 551 U.S. 930, 945, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007); Stewart v. Martinez-Villareal, 523 U.S. 637, 644-45, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998); Ford v. Wainwright, 477 U.S. 399, 410, 106 S.Ct.

2595, 91 L.Ed.2d 335 (1986). Our court recently rejected Williams's theory, holding that, unlike a Ford claim, an Atkins claim ripens before an execution is imminent and thus is governed by the requirements of § 2244(b) if raised in a second or successive habeas petition. Davis, 854 F.3d at 970-73. We reasoned that "Ford and its progeny focus on the inmate's competency at the time of execution," which "makes sense because competency can be lost or regained over time," and that in contrast, "Atkins focused exclusively on the prisoner's culpability or reliability at the time that the crime was committed." Id. at 971 (emphasis omitted). We noted that "the Supreme Court took great care to expressly limit the reach of Panetti to the unique circumstances of a Ford claim." Id. at 971-72 (citing Panetti, 551 U.S. at 945, 127 S.Ct. 2842). We declined to follow dicta in Sasser v. Hobbs, 735 F.3d 833, 846 (8th Cir. 2013), regarding proof of intellectual disability at the time of presumptive execution. We also concluded that because in Nooner v. Norris, 499 F.3d 831, 833 n.2 (8th Cir. 2007), the court had "expressly assumed, without deciding, that Atkins claims could be treated the same as Ford claims," that case bore no precedential value. Davis, 854 F.3d at 972. Accordingly, we held that "whether Davis is now, in 2017, intellectually disabled has no bearing on whether he had the requisite moral culpability for the murder that he committed in 1990," and we denied his motion for, among other claims for relief, leave to file a successive habeas petition. Id. at 972-73.

Williams concedes that his Atkins claim is similar to that in Davis, but he argues that Davis is distinguishable because the petitioner there, as the court noted, "failed to provide a single attachment, document, or factual allegation about his current mental abilities." Id. at 971-72. But, as mentioned above, we explicitly stated that

"whether Davis is now, in 2017, intellectually disabled has no bearing on whether he had the requisite moral culpability for the murder that he committed in 1990." Id. at 972-73. Likewise, in this case, whatever the strength of Williams's evidence of intellectual disability, it does not affect our conclusion that his claim is subject to the strictures of § 2244(b).

Williams next argues that "[t]o the extent that Davis is nonetheless controlling, it was wrongly decided for the reasons set forth herein and explained in the dissenting opinion." We reject this argument because we are bound by the opinion of the Davis court. See United States v. Jackson, 554 F.3d 716, 717 (8th Cir. 2009); United States v. Williams, 537 F.3d 969, 975 (8th Cir. 2008).

Williams contends that his claim of intellectual disability did not ripen until attorney Rosenzweig's recent withdrawal from Williams's current proceedings, because, until his withdrawal, Rosenzweig's conflict of interest prevented him from alleging his own now-alleged ineffectiveness in abandoning Williams's intellectual-disability claim in the state Rule 37 proceeding. At the outset, we note that this argument likely runs afoul of 28 U.S.C. § 2254(i), which provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." Williams cites Christeson v. Roper, —— U.S. ——, 135 S.Ct. 891, 893-96, 190 L.Ed.2d 763 (2015) (per curiam), but we are unconvinced that the Supreme Court's holding in that case—that substitute counsel under 18 U.S.C. § 3599(e) was required on the basis of a conflict of interest—would support Williams's theory that Rosenzweig's conflict of interest renders Williams's claim immune from the requirements of § 2244(b). In any event,

Williams's argument is based on the assumption that Rosenzweig rendered ineffective assistance in failing to pursue the Atkins claim, an assumption we are unwilling to adopt.

Williams argues that if he is not allowed to seek relief under 28 U.S.C. § 2254, he should be allowed to do so under § 2241, under which his claim would not be subject to the requirements of § 2244(b). Our court has held, however, that "§ 2254 is the only means by which 'a person in custody pursuant to the judgment of a State court' may raise challenges to the validity of his conviction or sentence or to the execution of his sentence." Singleton v. Norris, 319 F.3d 1018, 1023 (8th Cir. 2003) (en banc). Williams's arguments to the contrary are thus foreclosed.

■ Lastly, we reject Williams's argument that denying him the opportunity to seek relief under § 2254 or § 2241 would constitute a suspension of the writ of habeas corpus in violation of Article 1, Section 9, Clause 2 of the United States Constitution. See Felker v. Turpin, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (holding that § 2244(b)'s restrictions on second or successive habeas petitions "constitute a modified res judicata rule" and do not constitute a suspension of the writ of habeas corpus).

Accordingly, we hold that Williams's amended petition for writ of habeas corpus is a "second or successive" habeas corpus application subject to the requirements of 28 U.S.C. § 2244(b).

IV. Protective Application to File a Second or Successive Petition

Williams argues that he has satisfied § 2244(b)(2)(A)—that his claim "relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." He argues that Moore v. Texas provides such a previously unavailable, ret-

roactive rule. In Moore, the Court held that a state's authority under Atkins to determine who is intellectually disabled is limited in that the state cannot rely on outdated medical guidelines. 137 S.Ct. at 1048-53.

█ Our precedent forecloses Williams's argument. In Davis, our court stated:

> Nor do we find that the more recent Supreme Court cases cited by Davis have any bearing on his Atkins claim because they discuss purely procedural issues unrelated to Davis. See Goodwin v. Steele, 814 F.3d 901, 904 (8th Cir. 2014) (per curiam). Hall concerned the state's use of a strict IQ test score cutoff of 70 before allowing further evidence of intellectual disability to be considered. 134 S.Ct. at 1990. Davis does not allege that Arkansas applied an IQ test score cutoff to him. The recently decided Moore v. Texas concerned the state court's use of out-of-date medical guides, rather than contemporary guides reflecting the medical community's consensus, to determine whether the defendant was intellectually disabled. [—— U.S. ——] 137 S.Ct. 1039, 1044 [197 L.Ed.2d 416] (2017). But Davis does not allege that Arkansas uses out-of-date medical guides or otherwise fails to follow contemporary medical standards. Davis, in fact, fails to cite any case supporting his view that the procedural default rules of AEDPA must cede to his Atkins claim.

Davis, 854 F.3d at 970. Williams attempts to distinguish this case from Davis on the basis that he has "allege[d] that Arkansas uses out-of-date medical guides or otherwise fails to follow contemporary medical standards." The prejudice that Williams asserts, however, is that his counsel failed to obtain available evidence that would have shown Williams to be intellectually disabled, not that evidence of his intellec-

tual disability was rendered ineffectual by out-of-date medical standards. In any event, to the extent that Williams argues that Arkansas impermissibly used fixed cutoffs for IQ scores, this claim is closely analogous to Hall v. Florida, —— U.S. ——, 134 S.Ct. 1986, 1993-2001, 188 L.Ed.2d 1007 (2014), and thus his claim is barred by our holding in Goodwin v. Steele, 814 F.3d 901, 904 (8th Cir. 2014) (per curiam) ("Goodwin has not made a prima facie showing that the Supreme Court has held that Hall is retroactive."); see also id. ("Rather than announce a substantive rule, Hall 'created a procedural requirement that those with IQ test scores within the test's standard of error would have the opportunity to otherwise show intellectual disability.'" (emphasis omitted) (quoting In re Henry, 757 F.3d 1151, 1161 (11th Cir. 2014))).

█ Williams contends that the Davis court erred in holding that Moore discussed purely procedural issues. He argues that Moore is akin to the Supreme Court's ruling in Montgomery v. Louisiana, —— U.S. ——, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016), and thus should be held to have retroactive effect in his case. Putting aside Williams's criticism of Davis, we do not agree that Moore announced a new rule of constitutional procedure that must be applied in this case. The observation by Chief Justice Roberts that the Court had crafted "a constitutional holding," Moore, 137 S.Ct. at 1054, may presage an eventual ruling by the Court that Moore will be given a Montgomery-like effect, but that is a matter for the Court to decide in due course and not by us in the posture in which this case has been presented to us.[5]

Williams also argues that he has satisfied § 2244(b)(2)(B), but he has not shown that "the factual predicate for the claim could not have been discovered previously

---

5. We decline Williams's request that we certi-

fy to the United States Supreme Court pursu-

through the exercise of due diligence." He contends that he was unable to discover the evidence regarding his medical disability because Rosenzweig would have had to argue that his own assistance had been ineffective, which posed an insurmountable conflict of interest. Williams's argument that Rosenzweig was ineffective may be foreclosed by the prohibition on alleging the ineffectiveness or incompetence of counsel during federal or state post-conviction proceedings. 28 U.S.C. § 2254(i). Moreover, the single case that Williams cites to show that he could not have discovered the evidence with the exercise of due diligence is inapposite. Similar to our discussion above regarding the § 2244 bar, we are not convinced that Christeson v. Roper, provides Williams the relief he seeks on account of Rosenzweig's conflict of interest, and as mentioned above, we are unwilling to conclude that Rosenzweig rendered ineffective assistance.

## V. Conclusion

We deny authorization for the district court to consider Williams's second or successive habeas petitions. We deny Williams's application for a certificate of appealability. We deny Williams's protective application to file a second or successive habeas petition. We deny the motions for stay of execution that are pending in case Nos. 17-1892, 17-1893, and 17-1896. The mandate shall issue forthwith.

KELLY, Circuit Judge, concurring in part, dissenting in part.

## I. Motion for Relief from Judgment (17-1892)

The Sixth Amendment's guarantees of an impartial jury and the right of an ac-

cused to confront the witnesses against him extend to capital sentencing proceedings. See Morgan v. Illinois, 504 U.S. 719, 727–28, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); see also Parker v. Gladden, 385 U.S. 363, 364, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (noting that the Sixth Amendment applies to state court proceedings through the Fourteenth Amendment's Due Process clause). Compliance with these guarantees requires that a jury's verdict be based on the evidence presented "from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross examination, and of counsel." Parker, 385 U.S. at 364, 87 S.Ct. 468; see also Turner v. Louisiana, 379 U.S. 466, 472, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). As the Supreme Court has stated, "[t]his is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station of life which he occupies." Turner, 379 U.S. at 472, 85 S.Ct. 546 (internal citation omitted).

A defendant may challenge the validity of the jury's verdict through evidence that "extraneous prejudicial information was improperly brought to the jury's attention" or that "an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2); accord Ark. R. Evid. 606(b). Here, Williams has provided evidence that the jury was exposed to multiple types of prejudicial extraneous evidence directly relevant to the penalty phase of his trial.[6] First, one of the jurors (Juror A) was a teacher at the prison

---

ant to 28 U.S.C. § 1254(2) the question whether Moore is to be given retroactive effect.

6. According to the pleadings, the information recently gathered from the jurors was previously unknown to either party.

where Williams was then incarcerated.[7] It was also the prison where Williams would likely continue to serve his sentence if convicted. According to her sworn declaration submitted just this month, Juror A knew who Williams was and had seen him in the prison prior to the trial, but noted that she had never spoken with him. Juror A also said that she was familiar with how men were housed in the Cummins and Varner units at the prison—the units where Williams could be housed if convicted—and the differences between the conditions for inmates serving life without parole and those on death row. Juror A said that she shared this knowledge with her "fellow jurors." Williams also provided the declarations of two other jurors, who corroborated the fact that during deliberations, the jury heard this external evidence of the conditions inside the prison.

This is just the type of extraneous information that may undermine the validity of a jury verdict. A juror's general life experience is ordinarily considered "internal" information. See Warger v. Shauers, ___ U.S. ___, 135 S.Ct. 521, 529, 190 L.Ed.2d 422 (2014) (" '[I]nternal' matters include the general body of experiences that jurors are understood to bring with them to the jury room."). In this case, however, Juror A's daily life experiences allowed her to present "information related specifically to the case the jurors" were meant to decide. Id. Namely, Juror A's knowledge about differences between the prison conditions for inmates serving life in prison and inmates awaiting execution on death row, in the very prison where Williams was incarcerated, was directly relevant to the question the jury had to decide at the penalty phase: Should Kenneth Williams receive a sentence of life without parole or a sentence of death? The particular information

Juror A provided to the jury about this specific prison where this specific defendant was currently housed goes beyond general professional knowledge, see Houchins v. Home Care Prof'ls of Ark., 2012 Ark. App. 553, 423 S.W.3d 655, 662 (Ark. 2012), or "general views" about the issues in the case, see Warger, 135 S.Ct. at 529. Instead, Juror A's descriptions to the jury were more akin to "a juror's foray outside the courthouse to gather extrinsic information" about this specific case. Milner v. Luttrell, 2011 Ark. App. 297, 384 S.W.3d 1, 7 (Ark. 2011). In essence, Juror A became a fact witness in the penalty phase that Williams was denied the right to confront and cross-examine. See U.S. Const. amend. VI.

Second, Williams attached the declaration of Juror F. Juror F described how a number of Williams' family members attended the second or third day of Williams' trial. Shortly thereafter, "the Sheriff" told the jurors that a threat had been made against them. Juror F explained that from that point forward, the jury was dismissed each day before the rest of the people in the courtroom were allowed to leave. Yet another juror, Juror E, submitted a declaration in which she said that "everyone" on the jury "knew" that Williams had contacted and threatened a juror on his previous trial. Juror E said "[t]hat was scary," and that "knowing that Williams contacted a juror before spooks" her "to this day." The prejudicial nature of the threat-related external information is especially troublesome because at least some of it came from a law enforcement officer—a person of authority who bears a closer relationship to the court than a layperson. See Lewis v. Pearson, 262 Ark. 350, 556 S.W.2d 661, 664 (1977) ("Because of the close relationship between the bailiff and

---

7. At the time of trial, Williams was serving time at the nearby prison on a previous murder conviction for which he received a sentence of life without the possibility of parole.

the court itself any action on the part of the bailiff concerning the jury should be subject to close scrutiny by the court."). Information from an outside source that someone has threatened the jury—and that the defendant himself had previously threatened a juror—amounts to both extraneous prejudicial information and an improper outside influence that calls into question whether Williams was afforded his constitutional right to an impartial jury. See Owen v. Duckworth, 727 F.2d 643, 647–48 (7th Cir. 1984) (per curiam) (discussing the prejudice that may result from jurors believing a juror was threatened by the defendant); Stimack v. Texas, 548 F.2d 588, 588–89 (5th Cir. 1977) (two jurors' testimony that they received phone calls threatening that if they did not find the defendant "not guilty" they would be killed by the mafia was sufficient in habeas context to find impermissible "extraneous influence" on the jury); Lewis, 556 S.W.2d at 663–64 (bailiff's racist remark to juror on all-white jury created probability of prejudice warranting new trial).

Finally, Williams has presented a declaration from the jury foreperson, Juror B, who led the jury in prayer prior to deliberating on Williams' sentence. Juror B explained that there "is a higher power above the judge" and that the jury was "looking for guidance from a higher power to help us in our decision about [Williams'] sentence." Juror B was "sure there was a bible in the deliberation room, to help us and guide us in our decision." Other jurors submitted declarations corroborating that the foreman led the jury in prayer. The jury's group reliance on the Bible further indicates that the jury relied on extraneous information in sentencing Williams to death. See Oliver v. Quarterman, 541 F.3d 329, 336–39 (5th Cir. 2008) (collecting cases addressing juries' use of a Bible during deliberations and holding that jurors' collective use of Bible in sentencing deliberations constituted an external influence on deliberations).

Kenneth Williams deserves an evidentiary hearing to determine whether juror misconduct deprived him of his constitutional right to an impartial jury. The district court determined that Williams' claim constitutes a successive petition, and that Williams is precluded from pursuing this claim because he cannot overcome the procedural bar of § 2244(b). But Williams did attempt to pursue this issue during his state post-conviction proceedings; and he requested funds again when he filed his original § 2254 petition. He asked for funds to investigate potential juror bias in both state and federal court, and the requests were denied. True, the state court denied Williams' request for funds to hire an investigator because it concluded that Williams could offer no preliminary showing that an investigation would reveal evidence of jury bias or misconduct. And the federal court determined that the state court's ruling was not contrary to or an unreasonable application of Supreme Court precedent. But I struggle to blame Williams for these shortcomings: He lacked evidence of jury bias or misconduct *because* he was denied the resources to conduct the investigation in the first instance. And, he was denied the resources to conduct the investigation in the first instance *because* he lacked sufficient evidence of jury bias. If Williams had the financial resources at the time of trial or post-conviction proceedings, he would have pursued this claim. Indeed, within two weeks of the appointment of the Federal Defender's office Capital Habeas Unit, the juror declarations were obtained and the potential juror misconduct was unearthed. The only difference now, as far as I can tell, is access to adequate resources to conduct a thorough investigation in this capital case. Justice cannot depend on

whether a criminal defendant has the money to defend himself to the fullest extent.

The district court concluded that Williams' motion is not a true Rule 60(b) motion because it raises a new claim for relief instead of attacking the integrity of the prior habeas proceedings. See Gonzalez, 545 U.S. at 532 n.4, 125 S.Ct. 2641. Williams argues the district court's denial of funds to investigate juror misconduct was a "defect in the integrity of the federal habeas proceedings," see id. at 532, 125 S.Ct. 2641, and that the ruling "precluded a merits determination." Williams' motion does not readily fall into the "procedural defect" category in which he seeks to place it. See Ward, 577 F.3d at 932. The bigger defect, however, is in a criminal justice system that allows a potentially viable constitutional claim to evade review because the defendant lacked the resources to timely pursue the claim.

"There is a heightened need for fairness in the administration of death." Callins v. Collins, 510 U.S. 1141, 1149, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting from denial of the writ of certiorari). As we strive to enforce "a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual," we must not let procedural rules overpower constitutional questions. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). "Serious review of these claims helps to ensure that the government does not secure the penalty of death by depriving a defendant of his or her constitutional rights." Callins, 510 U.S. at 1157–58, 114 S.Ct. 1127 (Blackmun, J., dissenting from denial of the writ of certiorari). In my view, this case presents an example of the "unprecedented and unwarranted barriers to the Federal Judiciary's review of the constitutional claims of capital defendants." Id. at 1158, 114 S.Ct. 1127

(Blackmun, J., dissenting from denial of the writ of certiorari) (internal quotation omitted). As a result of these barriers, Kenneth Williams is scheduled to be executed without any court having considered whether his capital trial and penalty phase conformed to the fundamental guarantees of the Sixth Amendment. Because the rules against successive petitions prevent the court from reviewing Williams' constitutional claim, however, I must concur that this claim is barred as a second or successive petition.

## II. Amended Petition for Writ of Habeas Corpus (17-1892)

For the reasons I explained in Davis v. Kelley, 854 F.3d 967 (8th Cir. 2017) and Lee v. Kelley, 854 F.3d 544 (8th Cir. 2017), I believe that under the reasoning of Stewart v. Martinez-Villareal, 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998) and Panetti v. Quarterman, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007), AEDPA's bar on successive habeas petitions does not apply to Atkins claims filed after the state has obtained an execution warrant. Because Williams' execution is now imminent, AEDPA should not prevent the court from determining whether he is intellectually disabled, and therefore constitutionally ineligible to be executed.

Williams presents a prima facie Atkins claim that has never been addressed on the merits. Under Arkansas law, a person has an intellectual disability if he exhibits "(A) Significantly subaverage general functioning accompanied by a significant deficit or impairment in adaptive functioning manifest in the developmental period, but no later than age eighteen (18) years of age; and (B) a deficit in adaptive behavior." Ark. Code Ann. § 5-4-618(a)(1). Three psychologists who evaluated Williams have concluded that he has an intellectual disability under Arkansas' statutory defini-

tion, as well as prevailing clinical definitions. Those conclusions are supported by other evidence Williams has presented to establish his prima facie Atkins claim.

First, Williams has presented evidence of significantly subaverage general functioning. Williams has participated in seven intelligence evaluations over the course of his life. When corrected for the Flynn effect and sampling errors, his full-scale IQ scores were 79.5 (age 8), 75 (age 10), 76 (age 12), 70 (age 20), 66 (age 21), 76 (age 25), and 65 (age 25). Williams has also undergone full-battery neuropsychological testing with two different psychologists, once in 2000, and once in 2004. Both psychologists noted that Williams had intellectual impairments in several areas, including memory, language, attention, and abstract thinking.

Williams has also presented evidence that he has deficits in adaptive functioning that manifested before age 18. He repeated the first and third grades, attended special education classes, and left school in the ninth grade. His teachers reported that he had significant academic difficulties, and his test scores put him several grade levels behind his peers, particularly in the area of language skills. Outside of school, family members and neighbors report, he was unable to perform even rudimentary tasks, like completing simple chores, dressing himself, grooming himself, or using money. His teachers, family members, and neighbors further report that Williams was socially withdrawn and susceptible to peer pressure, that he had difficulties forming sentences and having conversations, and that he was prone to sudden mood swings and outbursts.

The state counters with evidence that, it contends, demonstrates Williams does not have an intellectual disability. But because Williams has established a prima facie Atkins claim, any conflicts between evidence supporting his position and evidence supporting the state's position should be resolved by a court on the merits after a full evidentiary hearing. "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man." Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). That purpose is not served by executing someone who has presented a prima facie claim of intellectual disability that has never before been considered by any court. See Atkins, 536 U.S. at 321, 122 S.Ct. 2242 ("Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that [the death penalty] is excessive [punishment] and that the Constitution 'places a substantive restriction on the State's power to take the life' of a[n intellectually disabled] offender.") (citing Ford, 477 U.S. at 405, 106 S.Ct. 2595).

Even if, as the court has now held, AEDPA's bar on successive petitions applies to Atkins claims filed on the eve of execution in a petition under 28 U.S.C. § 2254, such a bar should not apply to petitions filed under 28 U.S.C. § 2241. See Thomas v. Crosby, 371 F.3d 782, 808 (11th Cir. 2004) (Tjoflat, J., specially concurring) ("[W]e should not interpret the elaborate restrictions Congress established for § 2254 ... as curtailing or eliminating a convicted state prisoner's right to seek relief under § 2241."). To the extent that the procedural rules applicable to § 2254 frustrate our ability to reach Williams' Atkins claim, we should not extend those procedural rules to § 2241 where doing so would leave us "powerless" "to prevent a custodian from inflicting an unconstitutional sentence." Webster v. Daniels, 784 F.3d 1123, 1139 (7th Cir. 2015) (en banc). Extending AEDPA's successive petition bar to Atkins claims brought under § 2241 is particularly troublesome because "the Su-

preme Court had not yet decided <u>Atkins</u>" at the time Congress adopted AEDPA and thus it could not have accounted for the "narrow set of cases presenting issues of constitutional ineligibility for execution." <u>Id.</u> at 1138. "But <u>Atkins</u> . . . [was] decided by the Supreme Court, and [it] must guide our understanding of the law." <u>Id.</u> at 1139. If we interpret 28 U.S.C. § 2244(b)'s bar on successive petitions to prohibit any consideration of the merits of Williams' <u>Atkins</u> claim, it could lead "to the intolerable result of condoning an execution that violates the Eighth Amendment." <u>Id.</u> We can avoid this constitutional infirmity by permitting Williams to pursue his claim under § 2241. <u>Cf. id.</u> at 1139 ("[T]here is no categorical bar against resort to section 2241 in cases where new evidence would reveal that the Constitution categorically prohibits a certain penalty.").

Although we have previously rejected prisoners' attempts to evade AEDPA's restrictions by challenging the execution of their sentence under § 2241, we have not allowed those restrictions to prevent us from reaching the merits of a petition. <u>See</u> <u>Singleton v. Norris</u>, 319 F.3d 1018 (8th Cir. 2003) (en banc); <u>Crouch v. Norris</u>, 251 F.3d 720 (8th Cir. 2001). In <u>Singleton</u> and <u>Crouch</u>, we said that the petitions, whether brought under § 2254 or § 2241, were subject to § 2244(b)'s limitations. <u>See</u> <u>Singleton</u>, 319 F.3d at 1022–23; <u>Crouch</u>, 251 F.3d at 722–23. But, in both cases, we concluded that the petitions were not successive because their current claims "could not have been raised" in their earlier habeas petitions. <u>Singleton</u>, 319 F.3d at 1023; <u>see</u> <u>Crouch</u>, 251 F.3d at 724. We therefore reached the merits of whether "the State may execute a prisoner who has been involuntarily medicated" in <u>Singleton</u>, 319 F.3d at 1023, and denied as unnecessary Crouch's application for permission to file a successive habeas petition, returning the case to the district court for a merits

review, 251 F.3d at 725. The present case is the first time that the court has permitted the successive petition bar to prevent the substantive review of a claim brought under § 2241 challenging the constitutionality of the execution of a capital sentence. Because I cannot endorse this unwarranted and potentially constitutionally infirm extension of AEDPA's successive petition bar, I would not apply it to Williams' § 2241 claim and would instead address the merits. I therefore respectfully dissent from the court's conclusion that Williams' <u>Atkins</u> claim is a second or successive petition subject to the requirements of 28 U.S.C. § 2244(b).

### III. Protective Application to File a Second or Successive Petition (17-1896)

As stated above, I believe that Williams' <u>Atkins</u> claim is not barred as a second or successive petition. On this claim, therefore, I respectfully dissent.

### IV. Certificate of Appealability (17-1893)

Because I believe the issues are debatable among reasonable jurists, I would grant the application for a certificate of appealability on (1) whether Williams' <u>Atkins</u> claim is properly considered a second or successive petition under 28 U.S.C. § 2254, and (2) whether his <u>Atkins</u> claim is excepted from the bar on successive petitions because it was also brought under 28 U.S.C. § 2241.

Unfortunately, because Williams has not shown a likelihood of success on his claims, I reluctantly must concur in the denial of the motions for stay.